THE STATE OF WASHINGTON, *on the Relation of The Model Water & Light Company, Appellant,* v. THE DEPARTMENT OF PUBLIC SERVICE *et al., Respondents.*[1]

[1]Reported in 90 P. (2d) 243.

*Ed. Peirce,* for appellant.

*The Attorney General, Don Cary Smith, Assistant,* and *Fred J. Lordan,* for respondents Department of Public Service *et al.*

*Post, Russell, Davis & Paine,* for respondent Washington Water Power Company.

STEINERT, J.—Relator herein, The Model Water & Light Company, as plaintiff, began this proceeding against The Washington Water Power Company, as defendant, on June 10, 1933, by filing with the department of public works, now the department of public service, of the state of Washington, a complaint seeking relief with respect to certain alleged illegal charges for electrical energy which defendant had supplied to plaintiff during the period from September 1, 1916, to May 1, 1933. No hearing having been had on the complaint, plaintiff, on June 6, 1936, filed a supplemental complaint with the department seeking relief with respect to similar and other alleged illegal charges and overcharges for power service supplied to it by defendant during the period from May 1, 1933, to

May 1, 1936. A hearing was had on both complaints on November 19, 1936, and on July 7, 1938, the department made its findings and entered its order dismissing the proceedings. A writ of review was then obtained from the superior court of Thurston county, and, upon a hearing by the court, a judgment was entered sustaining the findings of the department and dismissing the review with prejudice. The plaintiff thereupon appealed to this court.

In its brief, relator presents to us twenty questions for adjudication. It will not be necessary to treat each question separately, since our determination of what we consider to be the controlling questions will dispose of all the rest.

Relator's claim with respect to illegal charges and overcharges is based upon an alleged unjust rate discrimination through which relator was charged more for electrical power than were other irrigation companies, under circumstances and conditions which are asserted to have been substantially the same. We will state the facts necessary to illustrate the basis of the complaint.

The Washington Water Power Company, which hereinafter will be referred to as if it were the sole respondent, has for many years been a public service company engaged in the business of generating, distributing, and selling electrical energy for power, lighting, and domestic uses throughout eastern Washington and parts of Idaho. It maintains a transformer station at the town of Opportunity, in this state, and a network of transmission lines in that vicinity.

Relator, The Model Water & Light Company, which hereinafter will be referred to either as relator or as the Model Company, is a Washington corporation engaged as a mutual service company in maintaining and operating the water system of Trelomo Irrigated

District, which comprises about four hundred acres of land near Opportunity, in the Spokane valley. The land, which had previously been acquired by the relator, was originally surveyed in ten-acre tracts, capable of further subdivision, and was held by relator for resale to persons interested in orchard culture. Relator's capital stock consisted of one thousand shares of the par value of one dollar each. As the tracts were sold, a proportionate part of the stock accompanied each sale. About thirty-five or forty families inhabit Trelomo Irrigated District.

Relator's water system was installed in 1911 for the purpose of supplying water for irrigation and domestic uses to each of the tracts. The system consists of a well, three electrically driven pumps, and the necessary water conduits. The maximum monthly amount of electricity used by relator during its irrigation seasons was about one hundred fifty kilovolt amperes. Throughout the entire time involved in this controversy, the point of delivery of electricity to relator was at its own premises, the meters being installed at the panels of its well. Respondent absorbed all line losses incident to the service.

From 1911 to 1916, electrical power for irrigation and domestic use was furnished by respondent to relator, under a five-year contract, at rates therein specified; those rates are not in controversy here.

At the expiration of the contract on June 1, 1916, relator entered into a ten-year contract with respondent for electrical energy upon the following

"SCHEDULE OF RATES AND DISCOUNTS

"First 50 kilowatt-hours (or less) per month, per kilovolt-ampere of maximum demand per month, ................................... $4.50

"Excess over 50 kilowatt-hours per month, per kilovolt-ampere of maximum demand per month, at ½¢ per kilowatt-hour.

"With the following discounts:

| | | |
|---|---|---|
| First ............... | $50.00, | net |
| Second ............. | 50.00, | 10% discount |
| Second ............. | 100.00, | 20%　" |
| Third ............... | 100.00, | 30%　" |
| Fourth ............. | 100.00, | 40%　" |
| Over ............... | 400.00, | 50%　"　." |

The contract further provided that the consumer should pay, as a minimum bill for each irrigation season consisting of four months, the sum of $12.00 per kilovolt ampere of the maximum demand during the season, and, for domestic service, a minimum bill of $5.00 per kilovolt ampere per month of the maximum demand for the month, during the remaining eight months of each year.

At the expiration of the second contract on June 1, 1926, the parties mutually agreed that it should be extended to October 1, 1926, at which time relator was given the option of entering into a third contract or else of taking service at respondent's published tariff then on file with the department. Relator elected to accept the tariff rate.

It appears that, during the period of the ten-year contract, relator had supplied the various owners of tracts in the district with electricity for domestic use at a flat rate. Respondent objected to the continuance of this practice, and insisted that meters be installed and that such service be purchased at the same rate as that which applied to other domestic users in the Spokane valley. Relator was unwilling to assume the expense necessary to conduct that part of its business on a meter basis, and, as a result of negotiations between the parties, relator on October 1, 1926, sold its lighting system to respondent. The irrigating system, however, was retained by relator.

From October, 1926, to January 1, 1929, respondent charged relator for irrigation power service according

to the rates specified in its schedule 23, filed with the department, and from January 1, 1929, to March 1, 1931, at the rate specified in its schedule 44, likewise filed. On March 1, 1931, respondent's schedule 46 became effective. That schedule, which is the only one appearing in the record, sets forth the following:

"RATE:

First 40 K. W. H. per K. V. A. of demand per month, 5c net or 5.5c gross per K. W. H.

Next 60 K. W. H. per K. V. A. of demand per month, 3c net or 3.3c gross per K. W. H.

Next 100 K. W. H. per K. V. A. of demand per month, 1c net or 1.1c gross per K. W. H.

All over 200 K. W. H. per K. V. A. of demand per month, 0.75c net or 0.825c gross per K. W. H.

"QUANTITY DISCOUNT:

The following quantity discounts are based on the net monthly bill:

First $200.00 .....................Net $200.00
Next $100.00, 20% discount.......Net 80.00
Next $100.00, 30% discount.......Net 70.00
All over $400.00, 40% discount.. ."

The schedule further provided that the net rates above given should apply only in case payment was made in full within fifteen days after the bill was rendered; otherwise, the gross rates therein specified should apply.

At all times since March 1, 1931, service has been supplied to relator by respondent on the basis of schedule 46.

In May, 1933, relator owed respondent the sum of $1,640 for past service supplied according to the rates charged. Relator thereupon gave respondent its promissory note in that amount. Likewise, in April, 1936, relator, for the same reason, gave respondent its promissory note for $2,800. Neither of those notes has been paid.

According to the computation made by relator, as it

appears in the record, the amount, including the two notes, owing by it to respondent on May 1, 1936, on the basis of the rates actually charged, was $4,365.11. Relator, however, complains that, during the entire period of service from 1916 to 1936, it was subjected to illegal charges and was overcharged a total amount, according to its computation, of $7,399.75. The difference, amounting to $3,034.64, it seeks to have applied as a future credit.

The overcharges claimed by relator are based upon alleged discriminatory rates for the same character of service rendered by respondent to two other water companies operating in the vicinity of Opportunity during the same period of time. It is, therefore, necessary to state the facts with reference to those companies.

Adjoining Trelomo Irrigated District, which is operated by relator, is the Opportunity Water District, comprising about 2,875 acres of land and operated by Modern Electric Water Company, which we will refer to hereinafter as the Modern Company. About three-quarters of a mile distant is the Vera Water District, containing about 2,200 acres and operated by Vera Light & Water Company, which we will refer to hereinafter as the Vera Company. The Modern Company maintains seven wells and ten or more pumps; the Vera Company maintains four wells and five or more pumping plants. At all times, however, their current was metered at respondent's transformer station; hence, all line losses were necessarily borne by the Modern and Vera companies. The two companies together used from 2,300 to 2,700 kilovolt amperes per month during the irrigation season.

In 1915, respondent and the Modern Company entered into a written contract, wherein respondent agreed to furnish to the Modern Company electrical energy for general irrigation purposes for a period of

seven years, with an option to the Modern Company to extend the contract for ten additional years. Under that contract, power was supplied for both the Opportunity and the Vera districts as one account. The contract provided the following:

"SCHEDULE OF RATES AND DISCOUNTS

"First 20 Kilowatt Hours per month or less per kilovolt ampere of maximum demand per month .................................... $1.50

Next 30 Kilowatt Hours per month or less per kilovolt ampere of maximum demand per month. 3¢ per K. W. H.

Next 50 Kilowatt Hours per month or less per kilovolt ampere of maximum demand per month. 1½¢ per K. W. H.

Next 300 Kilowatt Hours per month or less per kilovolt ampere of maximum demand per month. 1¢ per K. W. H.

Over 400 Kilowatt Hours per month or less per kilovolt ampere of maximum demand per month. ½¢ per K. W. H.

With the following discounts:

| | | | |
|---|---|---|---|
| First | $50.00 | Net | |
| Second | $50.00 | 10% | discount |
| Second | $100. | 20% | ” |
| Third | $100. | 30% | ” |
| Fourth | $100. | 40% | ” |
| Over | $400. | 50% | ” .” |

The contract further provided that the consumer would pay a minimum monthly bill of $1,200 from May to August of each year, and a minimum monthly bill of $300 for the remaining months of each year. The contract also provided that the Modern Company should furnish to respondent, free of charge, water for cooling its transformers; this item amounted to about $40 or $50 per month during the irrigation season and a lesser, but appreciable, amount, during the remainder of the year.

In 1922, the Modern Company exercised its option

to extend its contract for ten additional years. After the contract had fully expired, in September, 1932, respondent indicated that it would put both the Modern Company and the Vera Company on the rate specified in its schedule 46. However, at the instance of the department, which was then conducting a general rate investigation, the former rates prescribed by the Modern contract were continued during the irrigation season of 1933. On February 21, 1934, contracts were made between respondent and the two companies providing for irrigation power at the net rates prescribed in schedule 46, but with no reference made therein to gross rates in the event of failure to pay the bills within fifteen days after their rendition. Since that time, the Modern and Vera companies have been charged according to the rates set forth in the 1934 contracts.

It is apparent, from what we have recited above, that the rates charged relator according either to its contract of 1916 or to schedule 46 were greater than those charged the Modern and Vera companies under their contract of 1915. It is also apparent that the conditions under which the respective charges were made differed substantially in the following particulars: (a) amount of consumption, (b) point of delivery, and (c) supply of water to respondent for cooling its transformers.

Our disposition of the fundamental questions here involved necessitates a division of the time for which overcharges are claimed by relator into three periods: (1) From June 1, 1916, the date of relator's second contract, to June 10, 1933, the day on which its complaint was filed with the department; (2) from June 10, 1933, to March 1, 1934, the day on which the final contracts with the Modern and the Vera companies became effective; and (3) from March 1, 1934, to May 1, 1936.

The claim for alleged overcharges during the

first period is concluded by the law of this state. Rem. Rev. Stat., § 10363 [P. C. § 5554], requires every water company, and certain other public utilities, to file with the public service commission schedules showing all rates and charges made, all forms of contract, and all rules and regulations relating to rates, charges and service. Rem. Rev. Stat., § 10364 [P. C. § 5555], prohibits any change in rate or charge, or in any form of contract, or in any rule or regulation relating to rate, charge or service, except upon thirty days' notice to the commission and thirty days' publication thereof, or unless the commission shall order otherwise.

It must be assumed, until the contrary is shown, that respondent complied with the statute. There is no evidence here that respondent did not file a form of agreement such as was made with Model Company in 1916, or that the rate prescribed in that contract was ever challenged in the manner provided by law. That rate was, therefore, a lawful, scheduled rate during the term of the contract. Thereafter, the rate charged was fixed by schedule 46, which was never challenged until June 10, 1933, when the complaint in this proceeding was filed.

It is now settled law in this jurisdiction that, when a scheduled rate is challenged, the challenge affects the rate only from the date of the filing of the complaint, and there can be no reparation for alleged excessive charges imposed prior to that time. *Pacific Coast Elevator Co. v. Department of Public Works,* 130 Wash. 620, 228 Pac. 1022; *Puget Sound Nav. Co. v. Department of Public Works,* 157 Wash. 557, 289 Pac. 1006, affirmed, *En Banc,* 160 Wash. 703, 295 Pac. 949; *State ex rel. Standard Oil Co. v. Department of Public Works,* 185 Wash. 235, 53 P. (2d) 318; *State ex rel. Albers Bros. Milling Co. v. Department of Public Service,* 197 Wash. 622, 86 P. (2d) 196.

34

This disposes of the claim made for alleged overcharges during the first period.

Relator's claim for overcharges alleged to have been made during the second period, beginning with the filing of its original complaint, is rested upon the fact that Model Company was charged on the basis of the rate prescribed by schedule 46, while the Modern and Vera companies still were being charged on the basis of the lesser rates prescribed by the original Modern Company contract of 1915, which expired in 1932. Relator's contention is based on Rem. Rev. Stat., § 10367 [P. C. § 5558], which provides:

"No gas company, electrical company or water company shall, directly or indirectly, or by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for gas, electricity or water, or for any service rendered or to be rendered, or in connection therewith, except as authorized in this act, than it charges, demands, collects or receives from any other person or corporation for doing a like or contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions."

In connection with that section, there must also be read Rem. Rev. Stat., § 10368 [P. C. § 5559], which provides:

"Nothing in this act shall be taken to prohibit a gas company, electrical company or water company from establishing a sliding scale of charges, whereby a greater charge is made per unit for a lesser than a greater quantity for gas, electricity or water, or any service rendered or to be rendered."

The answer to relator's present contention is that it failed to prove that the conditions under which Model Company was served were substantially the same as those under which the other two companies were

served, or that the charges to which Model Company was subjected were not, in the language of Rem. Rev. Stat., § 10362 [P. C. § 5553], "just, fair, reasonable and sufficient," or, conversely, that the rate under which the Modern and Vera companies purchased was the just, fair and reasonable rate to be charged for service to Model Company. This answer would likewise apply to the alleged overcharges during the first period above mentioned, were they not already disposed of by what we previously have said.

The burden of proving that rates which have become effective are unreasonable ordinarily rests upon the party attacking them. *State ex rel. Seattle v. Public Service Commission,* 76 Wash. 492, 136 Pac. 850; *North Coast Power Co. v. Kuykendall,* 117 Wash. 563, 201 Pac. 780.

The department found that relator had not met the burden in the respects above noted. The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy. *State ex rel. Great Northern R. Co. v. Railroad Commission,* 60 Wash. 218, 110 Pac. 1075; *Puget Sound Electric R. v. Railroad Commission,* 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B, 763; *State ex rel. Great Northern R. Co. v. Public Service Commission,* 76 Wash. 625, 137 Pac. 132; *State ex rel. B. & M. Auto Freight v. Department of Public Works,* 124 Wash. 234, 214 Pac. 164; *Pacific Coast Elevator Co. v. Department of Public Works,* 130 Wash. 620, 228 Pac. 1022; *Great Northern R. Co. v. Department of Public Works,* 161 Wash. 29, 296 Pac. 142; *State ex rel.*

*Puget Sound P. & L. Co. v. Department of Public Works,* 181 Wash. 105, 42 P. (2d) 424.

During the time that rates and standards are in force they are the only lawful rates and standards. *Northern Pac. R. Co. v. Department of Public Works,* 136 Wash. 389, 240 Pac. 362; *Puget Sound Nav. Co. v. Department of Public Works,* 157 Wash. 557, 289 Pac. 1006; *State ex rel. Standard Oil Co. v. Department of Public Works,* 185 Wash. 235, 53 P. (2d) 318; *State ex rel. Albers Bros. Milling Co. v. Department of Public Service,* 197 Wash. 622, 86 P. (2d) 196.

A mere difference in rates does not, of itself, constitute an unlawful discrimination. *State ex rel. Puget Sound P. & L. Co. v. Department of Public Works,* 181 Wash. 105, 42 P. (2d) 424. A comparison of rates may be persuasive and may be controlling, but only when it is also shown that the conditions are comparable and that the rates used for comparison are just, fair, reasonable, and sufficient. *Logan City v. Public Utilities Commission,* 77 Utah 442, 296 Pac. 1006.

 Furthermore, mere discrimination, if there be such, is not, of itself, sufficient to call for reparation, however much it may call for some other remedy or disciplinary measures against the public utility company. *Oregon-Washington R. & Nav. Co. v. Department of Public Works,* 151 Wash. 142, 275 Pac. 87.

The fact that the Modern Company was not put on the schedule rate immediately upon the expiration of its 1915 contract did not, of itself, under the circumstances, constitute an unlawful discrimination as to relator. Respondent had endeavored to effect a change of rate but was temporarily prevented from so doing by the department. When the general investigation of rates was completed, respondent was permitted to enforce the schedule rate, thus indicating that its previous attempt was well founded. It was not incumbent

upon respondent voluntarily and immediately to reduce the effective rate as to all consumers merely because, temporarily, it had been suspended by the department as to one or two consumers. The peculiar facts relative to the particular circumstance would not support a finding of unlawful discrimination as to relator during that interim.

We are unable to discover wherein the department erred in its findings or conclusions. On the contrary, we believe that they are fully sustained by the evidence. This disposes of the second portion of relator's claim.

During the third and final period of alleged illegal charges the *net rates* of schedule 46 applied not only to Model Company, but also to the Modern and Vera companies. The only matter, therefore, that need be considered with reference to this phase of the controversy is the provision peculiar to the schedule under which Model Company is operating, wherein a *gross* rate is imposed in the event that payment is not made within fifteen days after the bill for service has been rendered. The contract of March 1, 1934, made with the Modern and Vera companies did not include that provision.

Relator contends, first, that such a provision is, in any event, unlawful, because it is a penalty, and, second, that, if lawful, it cannot be required of one class of consumers and not of another.

Upon the first contention, we are clearly of the opinion that such a provision, within reasonable limits, is valid. Its purpose is to place a premium upon the prompt payment of bills, for in that way efficiency in service is promoted. The public service commissions of thirty, or more, states of the Union have expressed that view, as may be found by reference to the published Public Utility Reports. In *Arizona Corp. Com-*

*mission v. Bisbee-Naco Water Co.,* 1 Ann. Rep. Ariz. C. C. 489, it was held that a premium should be placed upon the prompt payment of bills and a penalty assessed against delayed payments, since under proper regulation these moneys are, indirectly at least, technically the property of all the consumers, and if payments are unduly delayed, it is necessary that the working capital of the utilities be constructed from receipts derived from other sources.

This court has upheld a similar practice on the part of telephone companies. *State ex rel. MacMahon v. Independent Tel. Co.,* 59 Wash. 156, 109 Pac. 366, 31 L. R. A. (N. S.) 329. In that case, this court used this very pertinent language:

"Manifestly, if all the subscribers of appellant continuously refused to pay their rentals in advance, and thus necessitated the employment of collectors, additional office force, and the incurring of other expenses incident to the collection of such rentals, the moneys thus expended must be taken from the revenues of the company, and thus impair a fund to which the company must look for the expenditure necessary to keep its plant in the highly efficient condition required and demanded because of the public nature of the service. It is therefore not unreasonable that the company adopt a rule and enforce a regulation providing for the payment of its rentals in advance, and for an additional charge in case such requirement is not complied with. Such a charge is not an addition to the maximum rate provided for in the franchise. It is rather a charge for default and delinquency, which may be avoided by a compliance with the reasonable regulation for the payment of rentals in advance."

Cf. *Tacoma Hotel Co. v. Tacoma Light & Water Co.,* 3 Wash. 316, 28 Pac. 516, 28 Am. St. 35, 14 L. R. A. 669.

Cases from other jurisdictions holding the same view are the following: *Traverse City v. Citizens' Tel. Co.,*

195 Mich. 373, 161 N. W. 983; *State ex rel. Latshaw v. Board of Water & Light Commissioners,* 105 Minn. 472, 117 N. W. 827, 127 Am. St. 581; *Commonwealth v. Philadelphia,* 132 Pa. St. 288, 19 Atl. 136; *Girard Life Ins. Co. v. Philadelphia,* 88 Pa. St. 393; *Bower v. United Gas Imp. Co.,* 37 Pa. Super. Ct. 113.

Upon the second contention under this heading, what we have already said with reference to the proper remedy to be pursued in case a scheduled rate is not uniformly applied, is particularly pertinent here. If the penalty provision ought to be applied to all other consumers as well as to relator, and we see no reason why it should not be so applied, then the proper remedy is not to remove it altogether, but to compel its observance uniformly. That, however, does not furnish a basis of reparation to relator. This disposes of the remainder of relator's claim.

The judgment is affirmed.

BLAKE, C. J., MAIN, ROBINSON, and JEFFERS, JJ., concur.