[No. 28879. Department Two. August 5, 1943.]

MANLOWE TRANSFER & DISTRIBUTING COMPANY, INC., *Appellant,* v. THE DEPARTMENT OF PUBLIC SERVICE *et al., Respondents.*[1]

[1]Reported in 140 P. (2d) 287.

*Vanderveer, Bassett & Geisness,* for appellant.

*The Attorney General* and *Hugh A. Dressel, Assistant,* for respondent.

ROBINSON, J.—The department of public service originated this cause by filing a complaint, charging

the appellant with a number of violations of the laws and regulations governing its forwarding business. Hearings were held by the department, and findings, conclusions, and an order were made as to certain rates applied to shipments of sugar. The matter comes here on appeal from a judgment entered on a review of the order by the superior court. In this opinion, we will refer to the department as though it were the sole respondent.

The questions involved in this appeal are not satisfactorily stated in appellant's brief, because, as stated, they, to some degree, assume as true matters which are not sustained by the evidence. The respondent department, in its brief, makes no counter-statement of the questions involved, as required by rules of court, but, after pointing out that the court made no findings of its own, but merely ordered, adjudged, and decreed "that the findings and order of the Department of Public Service of Washington, complained of . . . be .and the same hereby are in all respects affirmed," quotes the appellant's assignments of error and argues that the first three cannot be considered. These assignments are as follows:

"1.  The court erred in finding that the Western States Grocery sugar was moving in intrastate commerce.

"2.  The court erred in finding that the movement of sugar from Seattle to the Spokane warehouse of the refinery's agent was intrastate commerce.

"3.  The court erred in finding that the transportation of sugar from Seattle to the Spokane warehouse for 'Lafferty' was intrastate commerce.

"4.  The court erred in affirming the order of the Department of Public Service to which the writ of review in this cause was directed."

It is the position of the respondent that, since the superior court made no specific findings, assignments 1 to 3, inclusive, may not be considered, and it is

further contended that assignment No. 4 raises only a very narrow question, since it is said:

"The superior court can only be in error in affirming the Department's findings and order if the findings are:
"1. Not supported by substantial evidence.
"2. Arbitrary and capricious.
"3. In error as a matter of law."

■ Since the court, in effect, adopted the departmental findings as its own, we think it would be over technical to hold that the first three assignments may not be considered. Nor do we agree with the position the respondent takes as to assignment No. 4. To sustain that position, the respondent cites a number of opinions of this court, for the most part rendered in cases arising under the unemployment compensation act, such as: *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877, and *In re Foy,* 10 Wn. (2d) 317, 116 P. (2d) 545, which cases have no direct bearing in the matter, since they are somewhat dependent upon the express wording of that statute.

■ We are not aware of any statute or decision of this court which requires it to accept a finding of the department of public service merely because it is supported by substantial evidence. The rule laid down by the court as to the effect to be given on review to the findings of the department of public service in *State ex rel. Model Water & Light Co. v. Department of Public Service,* 199 Wash. 24, 90 P. (2d) 243, is controlling. It reflects, as the opinion in that case shows, a great number of our previous decisions, and has been applied and quoted in a number of subsequent opinions. See, for example, *State ex rel. O. W. R. & N. Co. v. Walla Walla County,* 5 Wn. (2d) 95, 104 P. (2d) 764, in which it is quoted and reaffirmed. As stated in *State ex rel. Model Water & Light Co. v. Department of Public Service, supra,* the rule is as follows:

"The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy."

If the clear weight of the evidence is against the finding of the department, it will be set aside by the reviewing court, even though it be supported by substantial evidence. When it is remembered that, in many of these cases, the complaint is brought by the department, as it was in this case, and the department is, therefore, in effect, both the prosecutor and the finder of the facts, some substantial power of review as to facts must be left to the courts unless we are to abandon the fundamental safeguards of our jurisprudence. That this court has not abandoned these fundamentals is clearly shown by the recent *En Banc* decision in *State ex rel. Bohon v. Department of Public Service,* 6 Wn. (2d) 676, 108 P. (2d) 663, in which the court, *En Banc,* with but one judge dissenting, remanded a matter to the department, on the ground that the findings were not sufficiently definite to permit of intelligent review.

We quote the findings made by the department, attaching a number to each for convenience in reference:

(1) "The Respondent transported 19 shipments of sugar from Seattle to Spokane at rates which amounted to a total undercharge of approximately $1800 from the applicable legal tariff rates. These shipments were all transported for one shipper, Balfour-Guthrie Company at Seattle, to consignees at Spokane.

(2) "Respondent contended that movement of this sugar was interstate in character and said that the movement should be governed by interstate rates and not those in the Department of Public Service's tariffs or other tariffs of the Respondent applicable to intrastate traffic. The facts regarding this sugar movement,

as brought forth in the record, are as follows: The sugar is produced in the Philippine Islands and is refined there by the Insular Sugar Refining Company. Balfour-Guthrie Company are their selling agents on the Pacific Coast. The sugar is sent by steamer from the Philippine Islands to Seattle and the ocean-bill of lading shows that it is consigned to the order of the shipper (Insular Sugar Refining Company) notify Balfour-Guthrie and Company. The sugar is discharged at the East Waterway Dock from the steamer in Seattle. This is a public dock and warehouse. At the East Waterway Dock the sugar is held in the storage account of Balfour-Guthrie Company and that company pays the storage charges.

(3) "When Balfour-Guthrie Company make sales of the sugar, they make out a sales invoice showing a sale from Balfour-Guthrie and Company to the buyer at Spokane, if that is the buyer's location. The shipper in Manila does not know who the purchaser of his sugar or any portion of the same will be. It is the shipper's intention that the shipment move to Seattle to Balfour-Guthrie and Company whom he knows will probably sell it. The Insular Sugar Refining Corporation owns the sugar until it is sold in Seattle by Balfour-Guthrie and Company to some purchaser at another point in Washington. There is no indication on any of the shipping documents, when the sugar leaves Manila, that any part of the shipment will go to any consignee in Spokane or to any other point than to Seattle. The sugar is held at the East Waterway Dock in the regular stock of goods of the Balfour-Guthrie Company. Orders are filled from it as it is sold and it moves out of the East Waterway Dock as it is sold.

(4) "The representative of the East Waterway Dock testified that when they received a delivery order from Balfour-Guthrie and Company to deliver a certain quantity of sugar to the Manlowe Transfer & Distributing Company that they did not know that the sugar delivered on a particular delivery order came from any particular vessel; that they tried to deliver the first sugar that came in as the first to go out; that some sugar stays in storage between five and six months between the time it is delivered by

the vessels and the time it moves out of the warehouse.

(5) "He further testified that Manlowe Transfer & Distributing Company asked for steamer references to put on their bills of lading but that there was no connection between the steamer reference and the particular sugar that moved on that bill of lading and the record further shows this to be a fact.

(6) "There was testimony in the record that the shipments of sugar moving from Balfour-Guthrie Company, Seattle, to the Western States Grocery, Spokane, were delivered under a contract between the Safeways Stores and the Insular Sugar Refining Corporation; that this sugar was shipped from the Philippine Islands to the order of the Insular Sugar Refining Corporation notify Safeways Stores at Seattle; that Balfour-Guthrie Company did not issue invoices for this sugar. The record is clear, however, that this particular sugar was not consigned through directly from the Philippine Islands to the Western States Grocery at Spokane. It was delivered out of the Balfour-Guthrie stock at the East Waterway Dock and Balfour-Guthrie Company paid the storage on the same. The shipper in the Philippine Islands had no knowledge that this sugar would move beyond its destination of Seattle.

"It is our opinion that unquestionably the 19 shipments of sugar referred to, transported by the Respondent, were shipments in intrastate commerce."

It is not contended by the appellant that these findings are indefinite, or, except as to one or two minor features, that they are incorrect, but rather that they are incomplete and tend to include only those matters which are favorable to the conclusion stated in the last paragraph, above quoted. It is said, in appellant's brief:

"The facts which we must have to fix the status of the shipments cannot be taken from the findings of the Department alone because the findings of the Department, while setting forth the facts supporting the conclusion that the commerce was intrastate, ignore or minimize those facts which lead to the contrary conclusion; it being the evident thought of the author

that the findings should constitute an argument for the conclusion rather than a balanced presentation of all the facts. Such a method is particularly deceptive in cases such as this, in which, as the legal authorities from which we will quote repeatedly show, the true status of the shipments can only be determined by taking all of the circumstances together and arriving at a conclusion as to the essential character of the movement without placing undue emphasis on special features."

■■ The question as to whether a shipment is interstate or intrastate arises frequently in the state courts, but its solution in a given case is generally approached through the decisions of the supreme court of the United States, since, in such matters, its decisions are final and controlling. Speaking generally of the problem presented, it has said, in *Atlantic C. L. R. Co. v. Standard Oil Co.*, 275 U. S. 257, 72 L. Ed. 270, 48 S. Ct. 107:

"The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character, even though it be in the same cars. *Chicago, M. & St. P. Ry. Co. v. Iowa*, 233 U. S. 334. The change from rail to ship has often been held consistent with a continuity of interstate or foreign commerce, even though there may be only local billing. *Texas & New Orleans R. R. Co. v. Sabine Tram Co.*, 227 U. S. 111; *Railroad Commission of Louisiana v. Texas & Pacific Ry. Co.*, 229 U. S. 336; *Baer Bros. Mercantile Co. v. Denver & Rio Grande Railroad Co.*, 233 U. S. 479. On the other hand, in *Chicago, M. & St. P. Ry. Co. v. Iowa, supra*, the reshipment of an interstate shipment of coal after its arrival in the state in the same carload lots was held not inconsistent with the change from interstate to intrastate commerce. In *Baltimore & Ohio S. W. R. R. Co. v. Settle*, 260 U. S. 166, 170, a ship-

per billed his goods from one state to another, paying the interstate freight and reshipped them to another point in the second state, intending from the first to reach the latter destination, but interrupting the transportation only to take advantage of a difference in his favor between the through rate and the sum of those paid. It was held that the essential nature of the entire movement was in interstate commerce and that the shipper must pay the only lawful rate, which was the interstate commerce rate to the final destination. These cases are illustrations to show that the determination of the character of the commerce is a matter of weighing the whole group of facts in respect to it."

■ The findings of the department, in so far as they are factual, must be sustained. There is, in fact, little or no evidence to the contrary, but they must be read with the understanding that not all that is said in the findings, which we have numbered 1 to 5, inclusive, applies to the sugar dealt with in finding No. 6. We think the department was clearly right in concluding that, when the Insular Sugar Refining Corporation shipped sugar to Seattle, put it in storage, and it was then sold by its agent, Balfour-Guthrie Company, to such customers as might desire to purchase it, the distribution to these customers, or to its own substorage depots by rail or truck, constituted intrastate commerce. The decision of the United States supreme court, above cited, should be sufficient as to that point.

The appellant contends, however, that the fact that, in its distribution of the sugar, it uses only the facilities of the public ocean terminal at which the sugar is landed—itself an interstate and foreign commerce instrumentality—the sugar does not lose its character as an interstate shipment. We suppose that, if the Insular company had, or rented, a building of its own in Seattle, from which it distributed its sugar to such purchaser as might buy it, no one would deny that that activity was purely intrastate. The fact that,

instead of acquiring storage of its own, it uses the facilities of the public dock at which the sugar is discharged from the vessels, does not, in our opinion, alter the matter. But somewhat different considerations are involved with respect to those shipments dealt with in finding No. 6.

It is not found, in terms, in finding No. 6 that the sugar involved in the finding was shipped under a contract between the Insular Sugar Refining Corporation and Western States Grocery, or Safeway Stores, which is the same artificial person, but merely:

"There was testimony in the record that the shipments of sugar moving from Balfour-Guthrie Company, Seattle, to the Western States Grocery, Spokane, were delivered under a contract between the Safeways Stores and the Insular Sugar Refining Corporation; that this sugar was shipped from the Philippine Islands to the order of the Insular Sugar Refining Corporation notify Safeways Stores at Seattle; that Balfour-Guthrie Company did not issue invoices for this sugar."

In view of the fact that there is no evidence to the contrary, we assume that this amounts to finding that the sugar *was* shipped under such a contract, and that, for that reason, Balfour-Guthrie Company did not invoice that particular sugar to the Western States Grocery. There, in fact, is testimony in the record that Balfour-Guthrie Company's only relation to it was to assist in handling it and seeing it on its way to its ultimate destination. The finding continues:

"The record is clear, however, that this particular sugar was not consigned through directly from the Philippine Islands to the Western States Grocery at Spokane."

This, as we have already seen *(Atlantic C. L. R. Co. v. Standard Oil Co., supra)*, is a circumstance to be considered, but is not determinative. The finding continues:

"It was delivered out of the Balfour-Guthrie stock at the East Waterway Dock and Balfour-Guthrie Company paid the storage on the same."

Since the Balfour-Guthrie Company was the agent of the Insular company, this is consistent with the idea that the sugar remained consigned to the order of the Insular company until actually delivered to the consignee. Finally, it is found:

"The shipper in the Philippine Islands had no knowledge that this sugar would move beyond its destination of Seattle."

If it is meant by that that the shipper in the Islands did not know what particular bags of sugar would move beyond Seattle in fulfillment of the contract, the finding is strictly true, but if it is meant that the consignee was ignorant of the fact that the ultimate destination points of some of the sugar was well beyond Seattle, the finding is not supported by evidence.

Let us suppose that B corporation operates a store at Spokane, another at Yakima, and another at Walla Walla, and that, at the three, it sells about ten thousand bags of sugar a year. It contracts with the producer in the Philippine Islands to deliver six thousand bags to Spokane, two thousand to Yakima, and two thousand to Walla Walla. There can be no doubt but that the carriage from Seattle to those cities would be interstate, even if there was no through billing. But suppose also that, being unable to foresee how many of the ten thousand bags it would require at any one of the three cities, it arranges that the whole ten thousand will be shipped to the order of the consignor at Seattle, and that, at its (B's) direction, as many of the ten thousand bags will be delivered at Spokane, at Yakima, and at Walla Walla, as may be required by the demand at these respective points. We find nothing in the evidence to indicate that that was not, in

substance, the course of dealing here. Is not the "essential character" of the commerce in the second instance the same as it is in the first? We think that it is.

■ There is another matter which must be noted. There is no finding touching it, but considerable evidence. It is said, in the appellant's statement of questions involved, that the contract sugar was shipped in sacks, separately marked for Western States Grocery. This is not supported by the evidence. The sacks, intended for Safeway or Western States stores, were separately stored in the ships, but not individually marked. It further appears, and the fact is greatly stressed by the respondent in its brief, that, on numerous occasions, sugar from the general stock of the Insular Sugar Refining Corporation on the dock at Seattle was substituted in making delivery under the contract. This seems to have occurred when an expected shipment was delayed by irregularities in sailing, and there is evidence that this sometimes occurred when an unexpected demand exhausted shipments which arrived as scheduled. But, since one bag of sugar was exactly like another, we think that this did not destroy the "essential character" of the commerce. As to this point, see *Chicago Board of Trade v. Olsen*, 262 U. S. 1, 67 L. Ed. 839, 43 S. Ct. 470; *Carson Petroleum Co. v. Vial*, 279 U. S. 95, 73 L. Ed. 626, 49 S. Ct. 292; *United States v. Erie R. Co.*, 280 U. S. 98, 74 L. Ed. 187, 50 S. Ct. 51, and cases therein cited. For other authorities bearing upon the character of the commerce involved, see note, 60 A. L. R. 1465, entitled: "Breaking continuity of passage or shipment as affecting its interstate character," especially subhead III thereof.

The decree of the lower court is reversed and the matter is remanded, with directions to set aside that portion of the order under review which directs the appellant to collect undercharges with respect to the fourteen sugar shipments to the Western States Gro-

cery (Safeway Stores); otherwise, the order will stand affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.

---

September 27, 1943. Petition for rehearing denied.

---

[1]Reported in 140 P. (2d) 262.