557 P.2d 617

**AGRICULTURAL PRODUCTS CORPORA-TION (now Beker Industries),**
Appellant,

v.

**UTAH POWER & LIGHT COMPANY, and**
Idaho Public Utilities Commis-
sion, Respondents.

Application of UTAH POWER & LIGHT
COMPANY for Approval of its Proposed
Electric Service Regulations and Special
Contract Electric Service Rates.

No. 11927.

Supreme Court of Idaho.

Dec. 2, 1976.

**24**

Larry D. Ripley of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for appellant.

Wesley F. Merrill of Merrill & Merrill, Pocatello, Sidney G. Baucom, Salt Lake City, Utah, Dan L. Poole, Asst. Atty. Gen., Wayne L. Kidwell, Atty. Gen., Boise, for respondents.

McFADDEN, Chief Justice.

Utah Power and Light Company is a public utility serving customers in Utah, Wyoming and Idaho. Agricultural Products Corporation, now Beker Industries, operates the phosphate reduction fertilizer facility at Conda, Idaho. On December 28, 1973, Utah Power filed an application for approval of proposed electric service rates with the Idaho Public Utilities Commission, IPUC File No. U–100962. Permission was granted for Agricultural Products to intervene on March 5, 1974. On January 13, 1975, the IPUC issued Order No. 11736 granting rate charge increase relief to Utah Power for all customers. On January 16, 1975, Order No. 11746 was issued amending Order No. 11736 as it dealt with the amount of the rate contract increase approved for Agricultural Products. Agricultural Products and other intervenors filed motions for rehearing, which were denied. Only Agricultural Products has appealed. We set aside the order of the Idaho Public Utilities Commission insofar as it is applicable to appellant.

Two issues are raised on appeal: (1) whether the figures submitted by Utah Power to substantiate the claimed revenue deficiency upon which the rate increases were premised were "budget" figures and were adequate to support the increase granted by the Commission, and (2) whether there is competent evidence to support findings by the Commission of need for a different and higher contract rate charge increase for Agricultural Products. The facts and arguments relevant to each of the two issues are discussed separately below.

I

## USE OF BUDGET FIGURES TO ESTABLISH REVENUE DEFICIENCY

In attempting to document projected revenue deficiencies and establish the need for a rate increase, Utah Power offered financial exhibits termed "actual operating expenses for 1973, adjusted for 1974 operations in anticipated revenues and for actual and contracted or scheduled increases in expenses." Those figures were used to establish a test year and project revenue deficiencies. Based on that test year, and a determination that a rate of return of 8.-4% was reasonable, the Commission concluded that Utah Power would experience a $4,879,888.00 revenue deficiency. Rate charge increases were then granted sufficient to produce the revenues needed.[1] All

---

1. "IT IS THEREFORE ORDERED that the rates and charges contained in Utah Power and Light Company's proposed IPUC No. 8, Tariff No. 8, should be and the same

conclusions of the Commission were based on the use of the adjusted 1974 test year figures.

Appellant contends that those figures were really "budget" figures and were inadequate to establish a need for a rate charge increase. Use of budget figures has been discouraged because budgets are designed for and used for administrative purposes and do not illustrate need for rate relief, especially when actual results are available. *Re Idaho Telephone Co.*, 76 P.U.R.3d 520 (1968). Utah Power executive Stott testified that the figures presented were in effect the company's budget for the year 1974. Stott admitted that the purpose of preparing a budget was to control expenditures and that the company had control over many of the expenses listed. Another economic expert, Mr. Marshall, testified that there was a difference of approximately four million dollars in net operating revenue between the respondent's projected 1974 figures and actual operating results for the portion of 1974 which had elapsed at the time of the testimony. Appellant maintains that there is a lack of competent evidence to support a conclusion that the 1974 budget figures reflect a real revenue deficiency.

■ We disagree. The Public Utility Commission must find that rate charge increases are necessary before a rate increase is granted. I.C. § 61–622. When the Commission finds that rates charged are unjust, unreasonable, discriminatory or preferential, or are insufficient, it must set those rates at a just and reasonable level. I.C. § 61–502. Idaho Public Utilities Commission findings are conclusive on appeal if the overall effect of the rate charge fixed is reasonable and just. *Intermountain Gas Co. v. IPUC*, 97 Idaho 113, 540

P.2d 775 (1975). The question presented is whether the adjusted 1974 test year resulted in a reasonable and just finding that a rate charge increase was necessary.

Traditionally, public utility commissions have relied upon historical data to determine the need for rate increases. Although this procedure necessarily entails the use of antedated information, the method has been generally accepted as fair and accurate during non-inflationary times. In an inflationary and volatile economy, however, revenue and expense levels experienced in a prior year may be badly outdated 12 months later, and may fail to reflect real needs. The result may be that a utility is granted a lower rate charge increase which does not support current needs. Gibbons, "Some Legal Aspects of the Future Test Period in Utility Rate Regulations," 16 Ariz.L.Rev. 947, 948 (1974). Consequently, numerous utilities commissions have come to accept the future test year as a necessary and valid method for determining just and reasonable rates. *See, e. g., Re Florida Power and Light Co.*, 98 P.U.R.3d 441, 443 (Fla.Pub.Serv. Comm'n 1973); *Re Hawaiian Elec. Co.*, 96 P.U.R.3d 80 (Ha.Pub.Util.Comm'n 1972); *City of New York v. New York Pub. Serv. Comm'n*, 42 A.D.2d 259, 346 N.Y.S.2d 6 (1974); *Re Mountain States Tel. and Tel. Co.*, 73 P.U.R.3d 30 (Mont.Pub.Serv. Comm'n 1958); Gibbons, *supra.*

■ We hold that the use of an historical test-year, adjusted prospectively for anticipated changes, is a proper method to establish need for a rate change increase, where it is shown that the use of historical data will inadequately demonstrate real revenue needs, and where the future-year projections are shown by the applicant utility to be reasonably reliable and certain.[2]

are hereby denied; that Utah Power & Light Company is authorized to submit revised rates and charges and special contracts that will increase its annual revenues in the total amount of $4,879,888; and that the spread or allocation of such increased revenues among the various classes of service shall be made in accordance with Findings Nos. X through XIII of this Order.

Those findings allocate the increase among the various classes of customers, and provide a lesser increase for a Monsanto contract based on a fuel adjustment clause."

2. For a discussion of various factors which may be considered in accomplishing a reliable prospective forecast, see Gibbons, "Some Legal Aspects of the Future Test Period in

The court approves the procedure set forth by the Commission in *In Re Idaho Tel. Co.,* 76 P.U.R.3d 520, 525 (1969) :[3]

"The Company, in preparation of its case, should have taken the test year actual, which could have been the latest twelve-months available at the time the case was prepared, and then adjusted these actual figures for all known changes that could affect the results of the test year. The Commission could then have examined the test year and the adjusted test year and determined whether or not it agreed with the adjustments and make any alterations that it deemed proper under the circumstances."

■ In the instant case, the Commission found that use of an historical test-year would not adequately reflect the revenue needs of Utah Power:

"[T]he test year to be used in this proceeding to test the reasonableness of the proposed increased rates and charges should be the year ended December 31, 1973, adjusted for 1974 operations."

Finding No. IV.

In its order, the Commission noted that this finding was made "because prices were increasing so rapidly, and with large additions of new plant facilities placed in service to meet the economic growth of the company's service area, a historical test

year without adjustments for known and reasonable variations in revenues and expenses would be completely inadequate for a determination of the need for rate relief. * * * This proceeding has consumed most of the year 1974 and to use 1973 as a test year would not be representative of conditions that now exist." Order No. 11736, pp. 24, 25. Evidence supporting this conclusion is found in the prepared testimony of Mr. Stott, a Utah Power Vice-President, and does not appear to be controverted in the record.[4] We conclude that the Commission properly found that purely historical data would not adequately reflect real revenue needs.

The reliability of the 1974 adjustments was also established. The Commission notes that "Applicant's witness stated that the 1974 figures shown in the exhibits were more than near estimates of budgeted figures; the exhibit shows that the changes for 1973 to 1974 are based almost entirely upon actually known and measurable items, and cannot be considered as only budgeted estimates." It is true that Mr. Stott testified that the source of the 1974 adjustments was a "budget." However, the applicable test is not the name of the paper document from which the figures were retrieved. The test, notwithstanding any use of the term "budget," is whether the figures are reasonably certain and reli-

---

Utility Rate Regulation," 16 Ariz.L.Rev. 947, 961, n's. 91–94 (1974).

3. Although the Commission seemingly objects to the use of budget figures in this case, a closer examination of the case shows that it is not budget figures, per se, that are indicted. Rather, it is the stale nature of the figures, and the fact that no attempt was made to project the figures for known changes which was found at fault. It is clear in that case that the Commission would not have objected to the use of "budget" figures if those figures had been adequately adjusted, and their reliability shown.

4. At page 77 of the transcript, Stott testifies that "Prices have increased so rapidly, and with large additions of new plant facilities placed in service to meet the economic growth of our service area, such as the new Hunt-

ington Unit this year, a historical test year without adjustments for known and reasonably estimated variation in revenue and expense would be completely inadequate for a determination of the critical need for rate relief. A rate increase based on test year 1973 adjusted and as early in the year as possible is necessary in order to secure earnings that will be adequate to meet the interest and preferred dividends coverage tests under the mortgage and preferred stock covenants referred to in the Company's By-Laws. There is also a real possibility that the bond rating will be lowered on our first mortgage bonds at the next bond financing without early relief and in the amount requested. In summary, the year 1973 adjusted accurately sets forth the operating and financial position of the Company as it exists today and in the immediate months ahead when the rate increase hopefully will go into effect."

able adjustments of known historical figures.

Extensive testimony from witness Stott shows that the 1974 adjustments were carefully prepared and to a large degree reflect actual contracted or expended commitments. Exhibits 13A, 14A, 16A and 20 detail the percent of the 1974 adjustment amounts already spent or contracted.[5] The methodology employed in collecting the figures and estimating the adjustments is explained by Mr. Stott.[6] In sum, there is adequate evidence in the record to support a conclusion that the 1974 adjustments are reasonably certain and reliable.

The standard to be applied in appellate review of utility cases was articulated in *Intermountain Gas Co. v. Idaho Public Utilities Comm'n*, 97 Idaho 113, 540 P.2d 775 (1975):

"Our purpose is not to analyze each step of the rate-setting process to determine whether the regulatory agency was correct in its decision, but to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just. As the Supreme Court of the United States stated in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944): 'It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result

may contain infirmities is not then important. * * *'" 540 P.2d 775, 782. We are satisfied that the result reached by the Idaho Public Utilities Commission in allowing a general rate increase based upon the 1974 adjusted test year cannot be said to be unjust and unreasonable.

II

RATE INCREASE UNDER AGRICULTURAL PRODUCTS' CONTRACT

Agricultural Products takes power for its fertilizer operation at Conda under a ten-year contract agreement negotiated by Utah Power with El Paso Products Company in 1965. (Because of the interruption from 1967 to 1972, several years remain on the contract obligation.) Agricultural Products also takes power from Utah Power at three other points under scheduled rates. In 1967, El Paso ceased operation at its Conda plant and negotiated an interim minimum service contract effective until such time as El Paso resumed operations and once again took power at the levels envisioned by the contract. El Paso never did resume its industry. Rather, it sold all rights and interest in the Conda facility to Agricultural Products Corporation. In 1972, Agricultural Products commenced to operate the Conda plant. During the interim period between cessation of El Paso operations and the beginning of the Agricultural Products undertaking, Utah Power sought and received in 1971 an 8.8% increase in rates from all custom-

---

5. Stott testified that of the 1974 adjustments for electric plant in service, 65.4% was already purchased and paid for, and 24.5% was contracted for (Exhibit 13A); for total operating expense, electric, 84.6% is contracted and 12.1% is already scheduled (Exhibit 14A); total operating expenses, operation and maintenance, when pro formed for new rate schedules and operating expenses are 86.5% contracted and 11.0% scheduled (Exhibit 16A). All percentage bought, contracted and scheduled figures are introduced as Exhibit 20. In each case, less than 4% is unscheduled and estimated. Throughout cross-examination by appellant's counsel, Stott resists vehemently any leading question indi-

cating that the figures are anything less than reliable, refusing to admit that the figures are mere "budget" figures without adding that they represent real known quantities.

6. Stott testified in depth as to the method of determining the figures used in 1974 adjustments. Transcript, pp. 373–376. Among the measures used to insure the reliability of the estimates are visits to large customers and inspection of their books to determine future demand, computerized forecasting, use of national historical trends, and input of those contracted and scheduled expenses which were known at the time of the projections (see n. 5, *supra*).

ers (including contract customers) except El Paso. No increase was sought as to the El Paso contract because at the time it did not appear that the plant would ever be re-opened. From 1972 until the time of the instant rate increase request, Agricultural Products has been taking power at the Conda plant under the terms of the 1965 El Paso contract.

In this case, Utah Power has asked that the Agricultural Products contract rates be raised by the same amount as all other customers under the 1975 findings, plus an additional 8.8% to reflect the missed 1971 increase.

In Idaho Public Utilities Commission Order No. 11736, the Commission found that "the rate for Agricultural Products Company should be increased in the same percentage as for all other industrial general classes of service * * *," and an order was entered to that effect. In Order No. 11746, the Commission two days later revised that finding to read "That the contract rate for Agricultural Products Company should be increased to the same level as for all other industrial (general) classes of service * * * " and the previous order was amended to require "the increase for Agricultural Products Company is that contract rate required to bring said company to the same level as all other industrials (general)."

The effect of the Commission's final order was to increase the Agricultural Products scheduled rates commensurate with other customers, while raising its special service contract rates that amount plus an additional 8.8%. The record indicates that the bulk of Agricultural Products electricity is taken under the special service contract. Appellant contends that the record contains insufficient evidence to support the special, higher increase under the contract.

Evidence in the record supports a general revenue deficiency and the need for an overall rate increase. Evidence also indicates that Agricultural Products contract rates for service were not increased in the general 1971 rate increase because that company was not in operation at that time and it was not anticipated that operations would resume. Thus it is paying older and lower rates than other customers under the contract. There is no other evidence relating specifically to Agricultural Products, or the El Paso contract. There is no analysis as to the rate of return or revenue deficiencies under the contract, standing alone. No evidence is presented which attempts to establish similarity between Agricultural Products, as it takes electricity under the contract, and other customers. In sum, the only evidence substantiating a need for increased rates under the contract is the evidence of general rate increase need, and the evidence that the 1971 increase missed Agricultural Products.

The issue presented is the status of rate contracts: Does a showing of general need for rate increase justify an increase of a contract rate, and may a contract rate be raised merely to bring it to a level uniform with other customers? This court has never before dealt with the place of contracts in the scheme of public utility regulation. We first discuss that question.

It is apparent that the Idaho legislature intended to allow public utilities to enter valid private rate contracts when it created the statutory structure for public utility regulation. Several key statutes implicitly recognize private contracts by providing procedures for reviewing contracts among other rate types. See, I.C. §§ 61–307, 61–502, 61–503, 61–622, 61–623. Additionally, no provision in Title 61 can be construed as doing away with the right to contract for rates. In giving the Commission the power to deal with such contracts, the legislature intended to allow contracts to continue to be a part of the utility rate making process.

Contracts of any sort are protected by the Idaho Constitution, which provides in Article I, § 16 that no "law impairing the obligation of contracts shall ever be passed." Any contract is thus assured some measure of protection from governmental

interference. In determining the status of public utility contracts, and the ability of the Public Utilities Commission to alter the terms of such contracts, it is important to remember the special protected status given any contract by the constitution.

On the other hand, the state has a well established right to regulate public utilities. This court held in *Sandpoint Water and Light Co., Ltd., v. City of Sandpoint*, 31 Idaho 498, 173 P. 972 (1918):

"It is held uniformly and universally that the power to supervise and regulate rates or charges for services rendered by public utilities is an inherent function of government, and occupies a large place within the domain of the police powers of the state." 31 Idaho 498, 501, 173 P. 972, 973.

██ Pursuant to that power, it has been settled that the state may fix rates for a public utility service which will supersede rates previously fixed by private contract. Interference with private contracts by the state regulation of rates is a valid exercise of the police power, and such regulation is not a violation of the constitutional prohibition against impairment of contractual obligations. *Law v. Railroad Comm'n of California*, 184 Cal. 737, 195 P. 423 (1921). A Public Utility Commission may thus annul or supersede contract rates between utilities and their customers. *Midland Realty Co. v. Kansas City Power and Light Co.*, 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540 (1937); *Atlantic C. L. R. Co. v. Goldsboro*, 232 U.S. 548, 34 S. Ct. 364, 58 L.Ed. 721 (1914). Private contracts with utilities are regarded as entered into subject to reserved authority of the state to modify the contract in the public interest.[7]

██ However, the power to alter a rate contract is not unlimited. The United States Supreme Court noted in *Arkansas Natural Gas Co. v. Arkansas R.R. Comm'n*,

261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), that:

"While a state may exercise its legislative power to regulate public utilities and fix rates, notwithstanding the effect may be to modify or abrogate private contracts * * *. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed the exertion of legislative power solely to that end is precluded by the contract impairment clause of the Constitution. The power does not exist per se. *It is the intervention of the public interest which justifies and, at the same time conditions its exercise.*" 261 U.S. 379, 43 S.Ct. at 388 (emphasis added).

To justify state interference with the utility contract, there must be a finding that the rate "is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U. S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). As the Kansas Supreme Court has said:

"The necessity for an express finding of the unreasonableness of existing contract rates as a prerequisite to their abrogation is in recognition of the general rule that the state's power to modify or abrogate private rate contracts is incident to its power to regulate public utilities, the exercise of which is conditioned on the public interest. Absent this public interest, abrogation of contracts may not be effected merely to relieve one or the other of the parties from unprofitable or injudicious undertakings. * * * The requirement of an express finding of un-

---

7. 64 Am.Jur.2d, Public Utilities, § 81, p. 611 (1972). The parties to the El Paso contract apparently recognized this because they inserted in the contract provision number

14.1, "This agreement is subject to the approval and authority of regulatory bodies having jurisdiction."

reasonableness of the existing contract rates has strong support in policy, as effecting a workable compromise between contract stability on one hand, and the public interest in changing contracts when their rates become unreasonable on the other." *Central Kansas Power Co. v. State Corp. Comm'n*, 181 Kan. 817, 316 P.2d 277, 285, 287 (1957).

■ In the instant case, there was no showing of any specific factors which might lead to a conclusion that the existing contract is unreasonable vis-a-vis the public interest. The sole basis for the rate contract alteration is the inequality of the El Paso contract when compared to other customers. The next question is whether mere inequality of rates is so adverse to the public interest as to justify interference with the private contract.

The Idaho statutes set forth several duties of the Commission, including maintenance of just and reasonable charges, § 61–301, maintenance of adequate service, § 61–302, and various other duties. The statutes do not prescribe uniform rates for all customers. It cannot be inferred that the commission may alter contract rates merely to accomplish uniformity. However, the Commission is charged with the responsibility of preventing the establishment of any "unreasonable difference" as to rates. I.C. § 61–315.[8] The Commission could legitimately alter a contract which perpetuated or created any "unreasonable difference" as to rates.

It is immediately apparent that a mere difference in rates is not necessarily an "unreasonable difference." A public utilities commission may classify different customers into different rate schedules without breaching the "unreasonable difference" standard.

"A mere difference in rates does not, in itself, constitute an unlawful discrimination * * * A comparison of rates may be persuasive and may be controlling, but only when it is also shown that the conditions are comparable and that the rates used for comparison are just, fair, reasonable, and sufficient." *State v. Dept. of Public Serv.*, 199 Wash. 24, 90 P.2d 243, 249 (1939).

See, *Kiefer v. City of Idaho Falls*, 49 Idaho 458, 464, 289 P. 81 (1930); *State v. Dept. of Pub. Works*, 181 Wash. 105, 42 P.2d 424, 426 (1935); *Southeastern Land Co. v. Louisville Gas and Electric Co.*, 262 Ky. 215, 90 S.W.2d 1, 3 (1936); *New Haven v. New Haven Water Co.*, 118 Conn. 389, 172 A. 767 (Conn.1934); *Re A. A. Taxicab Co.*, 44 P.U.R.3d 421 (Colo.Pub. Serv.Comm'n, 1962); *Idaho Power Co. v. Thompson*, 19 F.2d 547, 580 (9 Cir. 1927).

■ In determining whether a lack of uniformity amounts to an "unreasonable difference," it is necessary to look to other factors than the rate level. "An unjust discrimination is not proved by the mere comparison of the rate fixed by one schedule with the rate fixed by another. To afford sufficient basis for comparison there must be evidence to show the difference in the conditions under which the rates were put in force." *Wedron Silica Co. v. Ill. Commerce Comm'n*, 387 Ill. 581, 57 N.E.2d 349, 351 (1944). We endorse the procedure employed by the New York Public Utilities Commission:

"Under the procedure we adopt here, a determination of undue discrimination or preference must first be made in a rate proceeding wherein all pertinent factors are considered, including, among others, the provisions of the special contract, the relationship between the contracting par-

---

8. "61–315. Discrimination and preference prohibited.—No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

ties, the cost of service, the financial condition of the utility, and the effect of contract rates on other customers. In the rate proceeding, the commission will consider whether some preferential rate may be appropriate in light of the specific circumstances surrounding each special contract. If it is then determined that the rates charged under special contracts are unduly discriminatory or preferential, we will order the utility to collect from contract customers sufficient revenues to eliminate any deficiencies." *Re Consolidated Edison Co.*, 4 P.U.R.4th 199 (N.Y.Pub.Ser.Comm'n 1974).

Under this procedure, the Commission will examine all pertinent factors in determining whether there is a reasonable basis for the different rates paid by Agricultural Products under the El Paso contract. The Commission must then make a finding on that point, based on the evidence. I.C. § 61–622.

It cannot be said that the Commission examined the reasonableness of the unique rate paid by Agricultural Products. Testimony establishing the existence of the non-uniform contract rate was based on the difference between the rate paid by Agricultural Products and other industrial (general) class customers, without proof of the propriety of such a comparison. Before the Commission may authorize a rate increase to bring Agricultural Products up to the level of industrial class customers, the Commission must find that Agricultural Products should reasonably be expected to pay the same rates at the El Paso contract delivery points as the general industrial customers. By way of example, we would note that the terms of the contract provide that the buyer shall install certain transformers and grant easements for transmission lines. These conditions may or may not be similar to the conditions under which other industrial customers purchase electricity. If these are items normally provided by the utility company, then Agricultural Products may rightfully claim that they are entitled to lower rates than general industrial buyers not providing the items. The Commission must first determine as a matter of fact what factors determine whether Agricultural Products should reasonably pay the same rates as other customers. It must then consider whether the different rate paid under the El Paso contract is unreasonable in view of all relevant circumstances, and must make specific findings before it may increase the rates charged to Agricultural Products under the contract.

In its order denying rehearing, the Commission commented that if Agricultural Products desired to have its contract rate exempted from the rate increase, it should have presented evidence of special circumstances. The burden, however, should not be placed on the customer. The cases cited above make it clear the burden is on the utility seeking a change in contract rates to show that the existing rates are contrary to public interest.

We would make clear that as to the general rate increase, there is adequate evidence to sustain the claimed revenue deficiency and justify the increase; thus, Agricultural Products may properly be subjected to the rate increase at its schedule points. However, before the Commission may alter the contract rates, it must find specifically that the rates being paid by Agricultural Products are adverse to the public interest. This showing may be by way of a showing of non-uniformity, but only if it is concluded that the difference is unreasonable.

Orders of the Idaho Public Utilities Commission set aside insofar as applicable to appellant. Costs to appellant.

DONALDSON, SHEPARD, BAKES and BISTLINE, JJ., concur.