586 P.2d 1346

**LOCAL 1494 OF the INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, Petitioners-Respondents, Cross-Appellants,**

v.

**CITY OF COEUR d'ALENE, Idaho, Respondent-Appellant, Cross-Respondent.**

No. 12774.

Supreme Court of Idaho.

Sept. 26, 1978.

Rehearing Denied Dec. 18, 1978.

E. L. Miller, Wm. D. McFarland, Glen E. Walker, City Atty., Coeur d'Alene, for City of Coeur d'Alene.

James M. English and Larry A. Wilde, Coeur d'Alene, for Local 1494.

BISTLINE, Justice.

This case involves a dispute between the City of Coeur d'Alene (the City) and Local 1494 of the International Association of Firefighters (the union or the firefighters), the collective bargaining agent for 17 firefighters who were terminated for their participation in a concerted action (a strike) against the City.

An existing collective bargaining contract between the City and the union expired on December 31, 1976, after which time the firefighters continued to work without a

contract. - An impasse in negotiations was reached on January 5, 1977, and the remaining issues were submitted to a fact finding commission pursuant to I.C. § 44–1805 to 1810. Relations between the City and the firefighters deteriorated during the long delay awaiting release of the fact finders' report. The firefighters went out on strike on May 6, 1977, and all those joining in the strike were discharged within the next two days.

Thereafter, the firefighters applied to district court for a writ of mandamus to compel the City to reinstate them. The district court ruled on May 24, 1977, that the procedures followed by the City had violated the due process rights of the firefighters and ordered their reinstatement. The City repeated the discharge process, this time complying with the relevant statutory provisions of the Idaho Code and the Civil Service Rules of the City of Coeur d'Alene. The Civil Service Commission held a public hearing on June 7, 1977, and, on June 13, 1977, issued its decision finding that the strike was illegal and that the discharge of the firefighters was justified.

The firefighters appealed the commission's decision to district court pursuant to I.C. § 50–1609. The district court concluded that even though the strike by the firefighters was illegal under Idaho law, the order of the Civil Service Commission terminating the firefighters "was not based on substantial evidence, was arbitrary, an abuse of discretion, and was not made in good faith and for cause." The district court entered judgment requiring the City to reinstate the firefighters and resume good faith bargaining.

Both the City and the union appeal. Appellant City of Coeur d'Alene argues that in hearing the appeal from the Civil Service Commission, the district court "assumed and exercised *de novo* jurisdiction" in violation of what is alleged to be an express restriction contained in I.C. § 50–1609. Analytically, this argument can be focused more precisely by directing attention to three separate aspects of the appeal in district court: (1) the manner in which the appeal was heard; (2) the standard of review exercised by the district court; (3) the

district court's entry of judgment reversing the commission order, mandating reinstatement of the firefighters and ordering further good faith negotiations.

1. *The Appeals Hearing.*

▇ In relevant part, I.C. § 50–1609 provides that when an appeal is taken from an order or judgment of the Civil Service Commission,

> The court of original and unlimited jurisdiction in civil suits shall thereupon proceed to hear and determine such appeal in a summary manner; . . .

That all parties to this action understood and fully complied with this provision at the appeals hearing is beyond dispute. In advance of the appeal to district court, attorneys for the City and the firefighters entered into a stipulation which states:

> that the hearing shall not be a trial de novo, but shall be in the nature of reviewing the decision of the Coeur d'Alene Civil Service Commission in light of the legal arguments presented on appellant's appeal.
>
> IT IS FURTHER STIPULATED that the Civil Service Commission Hearing transcript and all exhibits presented in the Civil Service Commission hearing shall be reviewable by the District Judge in making a determination.

That the district court hearing held on June 27, 1977, was in keeping with the above stipulation is manifest from the court minutes which begin as follows:

> Court in session. It is explained from the bench today's hearing is not a new trial, there will be no testimony, this is just a review.

The trial court heard oral argument of counsel, which consumed 30 minutes, following which the district court, within the confines of his chambers, made his review of the appeal record over a period of time extending from June 27, 1977, to August 25, 1977. It is clear, then, that the district court proceeded in the "summary" manner required by I.C. § 50–1609, and the procedure was that which the parties envisioned as required by said section and their stipulation.

## 2. *The Scope of Review in District Court.*

■ Appellant City next assigns as error what it alleges was the district court's improper procedure in entering its own findings of fact and conclusions of law. After the district court entered its appellant judgment, the City moved to strike the court's findings of fact and conclusions of law on the grounds that they were in violation of I.R.C.P. 52(a). That rule requires that a district court make findings of fact and conclusions of law in certain situations; it does not prevent the court from doing so in others. Despite the weakness of the City's theoretical underpinnings, its assignment of error on this point is not frivolous. It voices a very genuine concern regarding the appropriate scope of review which a district court must exercise in hearing appeals from a civil service commission.

The governing statute provides little guidance. I.C. § 50–1609 states only that

If such judgment or order be upheld by a majority of the commission, the accused may appeal therefrom to the court of original and unlimited jurisdiction in civil suits of the county wherein he resides. The court of original and unlimited jurisdiction in civil suits shall thereupon proceed to hear and determine such appeal in a summary manner; provided, however, that such hearing shall be confined to the determination as to whether the judgment or order of removal, discharge, demotion or suspension by the commission, was made in good faith and for cause, and no appeal to such court shall be taken except upon such ground or grounds.

The statute thus requires the district court "to hear and determine such appeal in a summary manner" and restricts court review to two particular issues.[1] It is, however, silent as to which standard of review the court is to employ or what disposition it may order.

■ We turn for guidance to the general principle of administrative law which holds that a court's proper function in reviewing agency actions is to consider whether, as a matter of law, the tribunal acted fraudulently, arbitrarily or capriciously, whether the administrative order is substantially supported by evidence, and whether the tribunal's action was within the scope of its authority. *Kansas State Bd. of Healing Arts v. Foote,* 200 Kan. 447, 436 P.2d 828, 831 (1968). Controversy usually centers around the definition of what evidence is "substantial" enough to support the commission decision. The "substantial evidence rule" is said to be a "middle position" which precludes a *de novo* hearing but which nonetheless requires a serious review which goes beyond the mere ascertainment of procedural regularity.

Nonetheless, in the case most strongly relied upon by appellant City, a majority of the Supreme Court of the neighboring state of Washington in 1966 showed itself satisfied with the "scintilla of evidence" rule, five members of the nine-member court saying,

We conclude that neither the superior court nor this court can consider the weight or sufficiency of the evidence.

*State ex rel. Perry V. City of Seattle,* 69 Wash.2d 816, 420 P.2d 704, 706 (1966). For that standard the Washington court reached back to 1937 and its earlier opinion in *State ex rel. Littau v. City of Seattle,* 189 Wash. 64, 63 P.2d 515 (1937), from which it quoted and wherein the court had stated that it could not inquire into the weight or sufficiency of the evidence where "competent evidence has been produced *tending, in some measure at least,* to prove the charges made . . . ." *Id.* 420 P.2d at 707 (emphasis added).

A strong dissent authored by the Chief Justice assailed the majority opinion in *Perry* as not being in keeping with the times, the dissent relying upon and quoting from Justice Frankfurter in *Universal Camera Corp. v. Natn'l Labor Rel. Bd.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), for the proposition that the "scintilla" or "any" evi-

---

1. Clearly the two issues are not exhaustive. The legislature could not, for example, have intended to exclude from district court consideration of constitutional violations of due process.

dence rule was not commensurate with the judicial function and duty to review the entire record to ascertain if the evidence in that "record as a whole" is found to be substantial. *State ex rel. Perry v. City of Seattle, supra,* 420 P.2d at 711 (Rosellini, C. J., dissenting).

Justice Frankfurter conducted a painstaking review of the history and analysis as to how courts had been functioning, and how henceforth they should function in making appellate reviews of agency decisions. He did so in 1951, some 14 years after the Washington court's opinion in *Littau,* during which period of time the administrative field had expanded manifold. We find ourselves unpersuaded by the Washington decision in *Perry,* which continued to uphold the "scintilla" rule of *Littau* almost 30 years later, and we expressly reject that narrow doctrine.

In so doing we are impressed by the legislative language of Idaho's Administrative Procedure Act, particularly I.C. § 67–5215(g)(5). This section, though not applicable here—since our concern here is not with the actions of a *state* agency or commission—serves to advise us of the legislative intent. Its provisions are clearly harmonious with the teachings of *Universal Camera Corp. v. Natn'l Labor Relations Bd., supra.* In that case is found the best explanation of the now discredited "scintilla of evidence rule":

> the courts are said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate—unless indeed the stage of arbitrary decision is reached. Under this interpretation, the courts need to read only one side of the case and, if they find any evidence there, the administrative action is to be sustained and the record to the contrary is to be ignored.

340 U.S. at 481, 71 S.Ct. at 461.

As pointed out therein, Congress had enacted an amendment to the Taft-Hartley Act, 61 Stat. 136, 29 U.S.C. (Supp. III) § 141 *et seq.,* 29 U.S.C.A. § 141 *et seq.,* whereby the judicial review standard of that Act was made to conform to the corresponding section of the federal Administrative Procedure Act, 60 Stat. 237, 5 U.S.C. § 1001 *et seq.,* where the substantial evidence rule already prevailed, and "[i]n order to clarify any ambiguity in that statute, however, the committee inserted the words 'questions of fact, if supported by substantial evidence *on the record considered as a whole* * *.' "* 340 U.S. at 485, 71 S.Ct. at 463 (emphasis in original). It is noteworthy and compelling, if not controlling, that the language of the Idaho Administrative Procedure Act is similar to that which was used in that amendment which brought the Taft-Hartley provision of judicial review standards into conformity with the federal Administrative Procedures Act. The United States Supreme Court, in *Universal Camera,* stated that under those provisions Congress had

> made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id.* at 488, 71 S.Ct. at 465.

Put simply, the substantial evidence rule requires a court to determine "whether [the agency's] findings of fact are reasonable." 4 Davis, Administrative Law Text § 29.01–02 at 525–530.

The standard, according to Professor Davis, is flexible with its application depending on such factors as

> [t]he character of the administrative agency, the nature of the problems with which it deals, the nature and consequences of the administrative action, the confidence which the agency has won, the degree to which the review would interfere with the agency's functions or burden the courts, the nature of the proceedings before the administrative agency . . . .

*Id.,* § 30.08, at 240 (1958), quoting the Attorney General's Committee on Administrative Procedure 91 (1941).

Several of the factors mentioned militate in favor of a liberal application of the substantial evidence rule in this case. For one thing, "the character of the administrative

agency," in this case differs significantly from that of the major commissions with statewide jurisdictions. This case may very well have been the Coeur d'Alene Civil Service Commission's first exposure to a problem of such magnitude. The commission appears to have performed its functions without the benefit of any staff, legal or investigative; in determining the standard of review in district court, such realities cannot be overlooked. As Professor Davis remarks:

Perhaps more meaningful than any word formula about review is the type of observation made by the Attorney General's Committee on Administrative Procedure: "The respect that courts have for the judgment of specialized tribunals which have carefully considered the problems and the evidence cannot be legislated away." The converse of this proposition is equally sound: The responsibility that courts of general jurisdiction have for assuring that serious miscarriages of justice are corrected is likely to prevail over words that are written in statutes by legislators who did not have in mind the facts and circumstances of the particular case in which conscientious judges believe that they need to step in.

4 Davis, *supra*, § 29.02 at 125.

Another factor which serves to vary the intensity of district court review of agency decisions is the structural make-up and function of the agency. At the one extreme there exist agencies like the Industrial Commission which, by statute, are balanced to reflect the conflicting interests which they routinely adjudicate and which function with a degree of detachment from earlier proceedings which parallels that of the judiciary itself. At the other extreme, there exist elected agencies such as school boards which must occasionally serve in the combined roles of complainant, prosecutor and judge and which have daily familiarity with the parties to a dispute. While there is nothing constitutionally impermissible about such a structure, a district court will not be blind to the distinction:

As a result of this combination of roles, its [the agency's] final adjudication often lacks that stamp of impartiality and of

disinterested justice which alone can give it weight and authority.

This anomaly in procedure makes it vitally necessary that in reviewing administrative decisions courts zealously examine the record with a view to protecting the fundamental rights of the parties . . . .

*State ex rel. Ging v. Bd. of Education*, 213 Minn. 550, 7 N.W.2d 544, 553 (1942). In the present case, the commission is one made up of local electors who have been appointed by the mayor with the advice and consent of the city council—the very people who are the real parties in interest in the dispute.

Furthermore, I.C. § 50–1609 envisions a situation whereby the commission is entrusted with reviewing (after a full hearing) *its own* earlier judgment (made in the first instance only on the strength of the City's accusation). In this case, though failing to follow the certification procedures mandated by I.C. § 50–1609, the commission appears to have made a predetermination on the merits of the discharges before holding its investigative hearing. On May 20, 1977, the commission had issued the following letter "TO WHOM IT MAY CONCERN":

It is the unanimous opinion of the Civil Services Commission that a strike was instituted by the firemen members of IAFF Local 1494 at midnight, May 6, 1977. This action is in violation of Civil Service Rule 12 which in its intent states that an employee who goes on strike under any circumstance shall be deemed to be no longer employed by the City.

The City Administration has terminated the above mentioned employees in accordance with Civil Service Rule 12.

Though purporting to be "the unanimous opinion of the Civil Services Commission," the letter was signed only by the chairman; no minutes were produced indicating that a meeting of the full commission was ever convened for consideration of the matter of the discharges.

The character of this commission, the roles committed to it by statute, and the manner in which the commission functioned in this case, required a most careful scruti-

ny of the whole record by both the district court and, in turn, by this Court.

A further fact which may serve to vary the standard of judicial review is the nature of the issue being reviewed. In the present case, the concern is not with an administrative/legislative type decision (e. g., rate-making) within the expertise of a specialized agency, but rather with what the district court referred to as "the right to a continual employment" of 17 civil service employees—three of whom have held their positions for more than 20 years. We have recently stated that such a right is a constitutionally protected property interest. *Ferguson v. Bd. of Trustees of Bonner Cty. School Dist. No. 82,* 98 Idaho 359, 564 P.2d 971 (1977); *Buckalew v. City of Grangeville,* 97 Idaho 168, 540 P.2d 1347 (1975).

■ While the legislature may properly allocate to an agency or commission the task of making the findings of fact and the initial decision, and does so in many and increasing instances, it would not be constitutionally permissible for the legislature to deny the employee a thorough and effective review of those findings and of that decision.

"[I]f a body other than one of the enumerated courts makes findings of fact, on those findings determines that the provisions of a certain statute have been violated, and issues an order or renders a judgment which has the effect of depriving a person of a valuable property right, such action denies the aggrieved party the due process of law guaranteed to him by the state and federal Constitutions, unless such action by such body may be questioned in a court of law. It should always be kept in mind that *the evil of administrative action which must be guarded against is not the fact-finding power, but the conclusiveness of the fact-finding power coupled with the order based on the findings made which would deprive a person of a property right.*

2. The commission decision in *Perry,* found at 706 of 420 P.2d, stated no findings or conclusion, only the ultimate determination couched in this language:

Such is the full exercise of judicial power, and such power in this state can be exercised only by one of the enumerated courts." (Emphasis added.)

*Electors of Big Butte Area v. State Bd. of Educ.,* 78 Idaho 602, 610, 308 P.2d 225, 230 (1957) (quoting from *Laisne v. State Bd. of Optometry,* 19 Cal.2d 831, 123 P.2d 457 (1942)). *See Foster v. Walus,* 81 Idaho 452, 347 P.2d 120 (1959); *State v. Finch,* 79 Idaho 275, 315 P.2d 529 (1957).

The City, again in reliance on *Perry,* argues that the district court here committed a *per se* violation amounting to reversible error by entering his own findings of fact and conclusions of law. In particular, the City relies upon the *Perry* majority for the proposition that:

The court is neither a find-finding agency, a policy-making body, nor a hiring hall. Its function is limited to testing the legality of the administrative procedure.

420 P.2d at 707.

The City, as we understand its reliance on the *Perry* case, reads it as standing for the proposition that because the superior (our district) court, on its appellate review, does not sit to determine what facts are proven to exist, it was error for the superior court to discard or disregard the findings of fact arrived at by the commission and make its own findings. We are unable to see that such took place, either in *Perry* or in the instant case. The Washington Supreme Court merely applied the scintilla rule whereas the superior court had not. The Washington Supreme Court did not intimate that commission findings had been discarded, or that the superior court had made its own to supplant those of the commission.

The firefighters in response to the City's use of *Perry* contend that the findings of the Coeur d'Alene commission were at best "mixed findings-and-conclusions on the discharge and strike issues,"[2] citing 2 Am. Jur.2d Administrative Law § 670 (1962):

The Commission further finds and concludes as *its independent judgment* on the matter that the dismissal of * * * [respondent] was for just cause. The action of

Where what purports to be a finding upon a question of fact is so involved with and dependent upon questions of law as to be in substance and effect a decision of the latter, the court will, in order to decide the legal question, examine the entire record, including the evidence, if necessary.

Where the district court in its review has examined the entire record, as is here the case, and where commission findings are conclusory and incomplete, as is here the case, the firefighters say that formulation of the facts, on points not in contest or found established, was necessary by the district court before it could properly perform the review function. We believe that the applicability and persuasion of *Perry* is best determined by the later Washington case of *Eiden v. Snohomish County Civil Service Comm'n,* 13 Wash.App. 32, 533 P.2d 426 (1975). In that case,[3] as does not appear to be so in *Perry,* the superior court, upon its review, *did* enter its own findings of fact and conclusions of law, some of which are to be found verbatim in the footnotes throughout the opinion. The Court of Appeals there responded to a contention of error, such as City makes here, that

the trial court did not err per se in entering these findings but, in making our independent review of the record, we must determine whether we *agree* with the trial court's findings, not merely whether such findings are supported by substantial evidence.

*Id.* 533 P.2d at 431 (emphasis in original).

The City's reliance on *Perry* is misplaced. First, as we point out, nothing in *Perry* substantiates the contention that the Washington Supreme Court reversed the superior court for having replaced the commission findings with its own. Secondly, we read *Perry* as a case holding that trial court appellate review is confined to a determination of whether there was *any* evidence to uphold the commission's conclusions. And, thirdly, seeing the need to rule upon the standard to be applied to the judicial review which a trial court makes of commission determination, we have rejected the "scintilla of evidence" rule in favor of the rule that the review be made to ascertain if there is substantial evidence on the basis of an examination of *the whole record.*

---

Chief of Police Ramon is therefore sustained. (Italics theirs.)

The ultimate conclusions in the instant case, captioned Findings of Fact, read:

We Find:

1. There are no religious or political reasons for the actions taken by the City of Coeur d'Alene according to the evidence introduced at the hearing.

2. The cause for the City's action was insubordination, willful disobedience of a direct order, and unlawful concerted action against the City of Coeur d'Alene. The City acted with justification insofar as due cause under Civil Service Rules are concerned. This is shown by the evidence that upon oral and written orders to report for duty the Firemen individually refused to comply and agreed as a group to strike, which is unlawful concerted action, insubordination and disobedience of direct orders under Civil Service Rules.

3. There is testimony to conclude the City acted in good faith in their decision made on May 6th to discharge the Firemen. The Firemen were adequately informed as to the consequences of their intended action. The City responded to the Union's action in conformance to Civil Service Rules and in the public interest.

The City of Coeur d'Alene sustained the burden of proof and in view of the foregoing, it is the ruling of the Civil Service Commission that the City of Coeur d'Alene has acted in accordance with Civil Service Rules and that the discharge of the following named members [names omitted] is confirmed and upheld.

3. In *Eiden v. Snohomish County Civil Service Comm'n, supra,* there was as here and in *Perry,* only a decision, to-wit:

After study of all testimony given at the hearing, a motion was made, seconded, and carried unanimously that it is the determination of the Civil Service Commission, based upon evidence presented at the Investigation and Hearing held August 28, 1971, that the discharge of James A. Eiden is not approved. That it is further determined that said James A. Eiden be reduced in grade to the rank of First Class Deputy and that he be returned to duty in the rank On September 8, 1971, with loss of pay for the interim period, and that the Chairman and Secretary be authorized and directed to so certify to the Sheriff and to Mr. Eiden.

533 P.2d at 428, which decision the appellate court specifically did not accord any status as amounting to findings.

■ While the dissenting opinion notes the "problem in this appeal" occasioned by the failure of the commission to make sufficient findings of fact and prefers that the district court "should have remanded to the Civil Service Commission to make adequate findings," the dissent forgets that the City has not raised any issue whatever in that regard, thereby evidencing its own satisfaction with a decision stating only the ultimate conclusions of the commission. Even in an ordinary case this Court would be ill-advised to grant the City a reversal upon an issue neither raised nor argued by it. *Ramseyer v. Ramseyer,* 98 Idaho 47, 558 P.2d 76 (1976); *Bair v. Barron,* 97 Idaho 26, 539 P.2d 578 (1975). Issues not presented to the district court simply will not be considered on appeal. *Dunn v. Baugh,* 95 Idaho 236, 506 P.2d 436 (1973). This is not an ordinary case. Here the firefighters have been discharged for almost 18 months, gaining a district court order for their reinstatement only to be discharged a second time. An able trial court could see as readily as can we that the commission findings were not as detailed as is desired.

As was said in *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1, 15 (1975), "[n]either the law nor good sense requires that this matter be sent back" to the commission for another go-around. The controlling statute does not mandate findings, I.C. § 50–1609, and, on the relatively undisputed record before it, the district court did not see fit, nor do we, to avoid a final decision. However, our decision should not be interpreted as negating the requirement of findings of fact by agencies whose proceedings are governed by the Administrative Procedure Act or by statutes that explicitly so require. *See Agricultural Products Corp. v. Utah Power & Light Co.,* 98 Idaho 23, 557 P.2d 617 (1976); *Swan v. Williamson,* 74 Idaho 32, 257 P.2d 552 (1953). As to the general desirability of detailed findings of fact by *all* administrative agencies, *see* 2 Davis, Administrative Law Treatise § 16.05, at 444 (1958).

■ On judicial review of a civil service commission determination, the district court *is* required to conduct a full review of the whole record and, where the commission's conclusions are unsupported by substantial evidence, its function encompasses stating, both for the benefit of the parties and this Court, its reasoning and conclusions which very well may but need not take the form of findings and conclusions. That is exactly what the trial court did in the present case. That the trial court, in rendering its appellate decision, did so by way of enumerated conclusions and enumerated findings, rather than in appellate opinion form, is without significance. The City's assignment of error on this score focuses on form rather than substance and is without merit.

### 3. The Disposition in District Court.

■ The Civil Service Commission in its decision of June 13, 1977, determined that the firefighters were not discharged for political or religious reasons; that the city acted in "good faith" in discharging the firefighters; and that the firefighters were discharged for "cause" in that they had been absent from work while conducting an illegal strike. The district court conducted a review of the whole record and concluded that the Civil Service Commission order upholding the discharge of the firefighters, "was not based on substantial evidence, was arbitrary, an abuse of discretion and was not made in good faith and for cause." On appeal, it is our task to make the same review of the commission's action as did the district court in order to determine whether, on the whole record, the commission's decision was substantially supported by the evidence and by applicable law.

The district court, addressing the legality of the strike, felt obliged to conclude: "Under the authority of the case of [*School District No. 351 Oneida County v. Oneida Education Ass'n,* 98 Idaho 486, 567 P.2d 830 (1977)], it is the Court's conclusion that the firefighters did not have the right to strike on May 6, 1977." Regardless of whether the *Oneida* case is relevant here,[4] the dis-

---

4. As mentioned below, firefighters are governed by specific statutes which were not at issue in the *Oneida* case. Further, the teachers'

strike in that case was an economic strike, not, as is here alleged, an unfair labor practice protest strike. The rules governing the two situa-

trict court was correct in observing that it was "still faced with the decision of whether or not the Civil Service Commission (and the City) abused its discretion and did not make its decision to discharge the firefighters in good faith and for cause." As the district court noted, neither the City nor the firefighters had access to the *Oneida* opinion (which was not released until July 22, 1977) when the strike occurred on May 6, 1977.

The all-important statute is I.C. § 44–1811, which reads in full:

> *Strikes prohibited during contract.* —Upon consummation and during the term of the written contract or agreement, no firefighter shall strike or recognize a picket line of any labor organization while in performance of his official duties.

At the time of the strike, the office of the Attorney General had twice written its advice on the subject and each side could point to a letter supporting its own interpretation of the above language. On April 18, 1975, an Assistant Attorney General had written to a union official interpreting I.C. § 44–1811 to mean that, "If the contract has expired, there exists an implicit assumption that firefighters have a right to strike and picket." On September 24, 1976, a different Assistant Attorney General reached the opposite conclusion in another letter to the same union official: "it is not proper to draw from Idaho Code, § 44–1811, prohibiting strikes during the term of a contract, an authorization to strike after the termination of such a contract and during negotiations on a new contract." [5]

Our own interpretation of this statute is guided by the established principles of statutory construction:

> In construing a statute, it is the duty of this court to ascertain the legislative intent, and give effect thereto. In ascertaining this intent, not only must the literal wording of the statute be examined, but also account must be taken of other matters, "such as the context, the object in view, the evils to be remedied, the history of the times and of the legislation upon the same subject, public policy, contemporaneous construction, and the like." *In re Gem State Academy Bakery,* 70 Idaho 531–541, 224 P.2d 529, 535 [1950].

*Messenger v. Burns,* 86 Idaho 26, 29–30, 382 P.2d 913, 915 (1963).

To begin with, then, "the literal wording of the statute must be examined." In all candor, it must be stated that the statute is not a model of clarity.[6] Literally, of course, the statute expressly prohibits strikes "upon consummation and during the term of the written contract or agreement." Regarding the period after expiration of the contract or agreement, the statute is silent. In such circumstances, this jurisdiction has generally subscribed to the rule of statutory construction which states, *expressio unius est exclusio alterius:*

> Furthermore, "It is a universally recognized rule of the construction that, where a constitution or statute specifies certain things, the designation of such things excludes all others." *Peck v. State,* 63 Idaho 375, 120 P.2d 820, 822; *Drainage Dist. No. 2 v. Ada County,* 38 Idaho 778, 786,

---

tions have been recognized as being distinct. See *Mastro Plastics Corp. v. National Labor Relations Board,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); *Rockwell v. Board of Educ. of School Dist. of Crestwood,* 396 Mich. 616, 227 N.W.2d 736 (1975).

**5.** The letter, by its own terms, dealt only with the rights of the firefighters "after termination of such a contract *and during negotiations on a new contract.*" It did not purport to address the situation the firefighters found themselves in on May 6, 1977, which was after the termination of the contract but also after an explicit

refusal on the part of the City to participate in negotiations.

**6.** In the words of the district court:

> All of the statutes in the State of Idaho are silent as to the right to strike if collective bargaining breaks down.
> The position of a fireman in the State of Idaho is not much better and our legislature, I think, have neglected and ducked the problem for a long time, and it's something that they should tackle. It's a legislative problem, and because they haven't tackled it, you find yourself in court when you shouldn't be.

226 P. 290; *People v. Goldman,* 1 Idaho 714.

*Poston v. Hollar,* 64 Idaho 322, 330–331, 132 P.2d 142, 146 (1942). In the present case, application of that rule leads to the conclusion that by expressly prohibiting strikes by firefighters during the term of a contract, the legislature either impliedly recognized their right to strike after expiration of the contract or, at a minimum, opened the door to such contractual agreement as the parties might reach in that regard.

That the literal wording of the Idaho statute lends itself readily to such an interpretation is seen from a comparison with those of other states. Those states which have an absolute ban against strikes by public employees have made that position unmistakably clear. The Revised Statutes of Kentucky, for example, contain the following language:

> Sec. 345.130. *Fire Fighter or Labor Organization Not to Participate in Strike.* —No fire fighter shall engage in, and no fire fighter labor organization shall sponsor or condone any strike.

Oklahoma also states its "strike ban" policy unequivocally, though in somewhat more expanded form:

> The protection of the public health, safety and welfare demands that the permanent members of any paid fire department or police department in any city, town or municipality not be accorded the right to strike or engage in any work stoppage or slowdown.

Okl.Stat. tit. 11, ch. 13F, § 548.2. States which have an absolute strike ban frequently combine this with elaborate procedures for resolving unfair labor practice disputes, Ky.Rev.Stat. § 345.070, as some form of binding arbitration, Okl.Stat. tit. 11, ch. 13F, § 548.9.

The language adopted by the Idaho legislature in I.C. § 44–1811 stands in stark contrast to the language contained in absolute strike ban statutes. By refusing to enact an absolute no-strike statute, with its correlative provision for conflict resolution by way of compulsory arbitration, Idaho might be said to have thus cast its lot with those states which are said to have recognized or granted their public employees a "limited strike right," including Alaska, Hawaii, Minnesota, Montana, Oregon, Pennsylvania and Vermont. *See* Public Employee Bargaining ¶ 6500 *et seq.* (CCH 1977).

Such a reading of I.C. § 44–1811 is reenforced by the legislative history of the present statute, which was given to the commission and in the appeal record for review by the district court. The history is illuminating both with regard to what the statute includes and what it omits. In their presentation to the commission, both parties were cognizant of the importance of evidence bearing upon legislative intent as a factor for consideration in determining the construction and interpretation of a statute. Arlen James Martinez testified as to legislative intent, having been called to the stand by the firefighters. He had been president of the Idaho State Council of Firefighters for 7 years, and prior to that he was president of a local unit in Boise. At the time of his testimony, he was an international vice-president for the district encompassing Idaho, Montana, Washington and Alaska.

According to his unchallenged testimony, Mr. Martinez, as president of the Idaho Council, in 1969 was the lobbyist in charge of the 1969 push for collective bargaining legislation; he identified Senate Bill 1059, which is a part of the record. This bill prohibited any striking,[7] but provided for binding compulsory arbitration in the event of an impasse. According to his testimony, the bill passed in the Senate by a 30–0 vote, but failed to get out of committee in the House. He stated that in 1970 the bill was changed so as to eliminate the provision for compulsory and binding arbitration, and a new bill containing the

---

7. The title of Senate Bill 1059 read in part, as applicable to Section 12: PROHIBITING FIREMEN FROM STRIKING OR RECOGNIZING PICKET LINES WHILE IN THE PERFORMANCE OF THEIR OFFICIAL DUTIES. Section 12 of the text of the bill reads:

> No fireman shall strike or recognize a picket line of any labor organization while in the performance of his official duties.

present language of I.C. § 44–1811 was submitted to the legislature and duly enacted. He testified to the following exchange which took place between an inquiring senator and the proponent of the 1970 bill:

> The question was asked by one of the senators, "I notice that the no-strike clause was removed from the original law that the firefighters had before this legislature, and the present wording is different."

> And the introducer of the legislation said, "That is correct." And they discussed it at some length. I can't give you the word-for-word verbatim discussion, but I in my mind am quite sure that the legislative intent was there because they knew the no-strike clause was removed and this wording was added in place of it.

The City indicated to the commission that it would supplement the record as to legislative intent with the testimony or deposition of Gary Ingram, State Representative from District Two, to which there was no objection and only the response that Mr. Ingram might not have been a member of the legislature in 1970. However, the City did not call Mr. Ingram, nor did it seek to supplement the record with his deposition testimony. Hence, the commission and, in turn, the trial court and this Court are left with testimony indicating that the legislature passed I.C. § 44–1811 after the failure of a previous bill which contained an absolute strike ban. Such testimony is entitled to serious consideration. *See National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). *See also Data Access Systems, Inc. v. State, Bur. of Securities,* 63 N.J. 158, 305 A.2d 427, 432 (1973), where, as to the extrinsic material which was offered to aid in the interpretation of a particular statute, the Supreme Court of New Jersey said:

> Our conclusion as to the meaning and true intent of the statute is reached without reference to any extrinsic materials. There is really no ambiguity in the enactment and hence no compelling need to resort to interpretative aids. The value of these materials in this case lies in the confirmation which they bring. Not only

may extrinsic aids be used to resolve legislative ambiguities, *N. J. Pharmaceutical Ass'n v. Furman,* 33 N.J. 121, 130, 162 A.2d 839 (1960); *Westinghouse Electric Corp. v. Board of Review,* 25 N.J. 221, 226, 135 A.2d 489 (1957); *Fisher-Stevens, Inc. v. Director, Division of Taxation,* 121 N.J.Super. 513, 517–518, 298 A.2d 77 (App.Div.1972), certif. den. 62 N.J. 575, 303 A.2d 328 (1973), they may also appropriately supply reassuring confirmation of literally apparent meaning, as is here the case. *Deaney v. Linen Thread Co.,* 19 N.J. 578, 585, 118 A.2d 28 (1955). Nor do we think it is improper to consider materials which may never have met the legislative eye. While a proposed enactment may first see the light of day in legislative chambers, its conception and preparation have frequently taken place elsewhere. This is normally true of administration proposals. Of course such materials must be carefully scrutinized and their weight and authenticity evaluated, but we see no merit in a rule demanding their total exclusion from judicial consideration.

■ All the lines of analysis converge. The literal wording of I.C. § 44–1811, the general rules of statutory interpretation, and the legislative history strongly suggest that the present statutory wording is a result of the above-mentioned compromise. Strikes are prohibited after consummation and during the term of a written contract. In that period of time after the old contract expires and before the new one is consummated, they are not prohibited and the parties are free to negotiate one way or another depending upon their relative economic strengths.

In the present case, it is clear that both parties understood that they could so contract and that they did so. Article V of the 1976 collective bargaining agreement between the City of Coeur d'Alene and Local 1494 of the International Association of Firefighters contained the following provision:

> During the term of this Agreement no fire fighters shall strike or recognize a

picket line of any labor organization while in the performance of his official duties. *Failure to sign subsequent agreement is only cause for strike.* (Emphasis added.)

During negotiations for the 1977 contract, a similar provision was approved by both sides, and of singular interest here provided that the City would not engage in lockouts:

The Union and the Employees agree that during the term of this Agreement, they will not cause, encourage, participate in or support any strike or picketing against the City or on any slowdown or other interruption of or interference with the normal functions of the City, nor will there be any lockouts by the City, concerning any matter which is subject to the grievance procedure. The Union and the Employees further agree, that during the term of this Agreement no firefighters will recognize a picket line of any labor organization while in the performance of his/her official duties. *Failure to sign subsequent agreement, shall be the only grounds for a strike.* (Emphasis added.)

The above provisions make it clear that, in the contemplation of the parties, after expiration of the collective bargaining agreement between the City and the union on December 31, 1976, the firefighters had a residual right to strike. To hold the contrary, we would have to hold that the firefighters were without *any* right to strike. Such a holding would be tantamount to saying that the legislature was engaged in a meaningless and useless endeavor when it enacted I.C. § 44–1811, and this we decline to do.

█ We conclude that the controlling statutes do not prohibit the firefighters from striking. That being so, the door was open for the City and the firefighters to contractually recognize a right to strike, which they did. We hold, therefore, that the district court erred in ruling that the firefighters were engaged in an "illegal strike." The strike was not illegal and, if challenged in court by the City, would not have been enjoinable.

A final question remains as to whether the firefighters' right to strike includes, as one of its elements, a right not to be discharged in the event a strike occurs. This question has not been addressed by either the City or the firefighters, although it was subjected to argument when Mr. Martinez was on the stand under cross-examination.[8] Its answer is not to be gleaned from the language of the statutes. Nor is the intent

---

8. Q. Mr. Martinez, with respect to the legislation which you made reference to and have a copy of there, I didn't understand who authored that legislation.

A. The author was the International Association of Firefighters, Idaho State Council of Firefighters.

Q. Do you agree with me that in the private sector a private employer, absent legislation to the contrary, could terminate a person for striking?

A. Absence of language in the contract?

Q. Right.

A. Yes.

Q. Do you take the position that absent language to the contrary a public employee is not so restricted?

A. I would have to agree with you to a point, but I think the language in this particular contract is to the contrary.

Q. Are you telling me then, sir, that probably a public employer has a right to terminate a person for striking unless there is language in the contract to the contrary?

A. I would say it depends upon what the state law said and the contract.

Q. And is there a state law that, in your opinion, directly gives the public employees the right to strike and deprives the public employer of the right to fire him?

A. There is no law that gives public employees anything. There is a law that gives firefighters—

Q. Firefighters, they are public employees, are they not?

A. (Nods head.)

Q. So your answer to my question is what, sir?

A. Ask me the question again.

Q. I'm asking if you agree with me that there is nothing in Idaho law that deprives a public employer, absent a contract to the contrary, of the right to fire a firefighter for going on strike?

A. Absence of state law or a contract, I would agree with that.

Q. Is there anything in the state law to your knowledge that deprives the public employer of this right?

A. Not at this particular time.

of the parties clear from the language of their contract. In the absence of the protective language of a contract, it would appear to follow that the firefighters' refusal to report to work when ordered to do so gave the City "cause" for discharge under I.C. § 50–1609.

Assuming without deciding that such "cause" existed, we turn to the district court's ruling that there was no substantial evidence to support the commission's finding that the discharge had been made in "good faith." The district court stated that the City had not acted in good faith in the following particulars:

A. By withdrawing benefits, especially food allowances from the Firefighters during the fact finding process.

B. By advising the Firefighters that even if a new contract were entered into, the same would not be retroactive to January 1, leaving the Firefighters to believe that the withdrawn benefits would be forever lost.

C. The long delay of the Fact Finding Commission to return a report cannot be considered the fault of the City. However, it is obvious that the City used such delay to its advantage in steadfastly refusing to pursue any negotiations without a written report and refusing to accept even a verbal report from the Fact Finders to be used as a basis for continuing the negotiations.

D. In anticipation of a strike, the City determined that the only course of conduct was to discharge the Firefighters in order to hire new ones. Injunctive relief was not considered as a valid, alternative solution.

The court also made reference to the numerous procedural errors at the time of the first attempted discharge of the firefighters in early May as an index of the "bad faith that permeated the entire affair."

▆▆ Our review of the record in this case leads us to conclude that the district court, acting in its appellate capacity, was correct in ruling that there was no substantial evidence to support the Civil Service Commission's finding that the discharge of the firefighters was made by the City in

"good faith." The district court's summary of the City's dealings coincides with our own reading of this record:

that the City, making an early determination that the Firefighters, as public employees, did not have the right to strike, did not act in good faith in the bargaining process, but pursued a hard line approach to the problem, the effect of which drove the Firefighters to the wall and into a strike that the Firefighters believed not only to be justified, but also legal in Idaho.

To summarize: We reject the approach of the City that it could refuse to bargain in good faith, secure in the belief that the firefighters had no right to strike. We find no such prohibition in the relevant statutes. We likewise reject the extreme viewpoint at the opposite end of the spectrum, namely, that the firefighters were, absent their having contractual provisions to that effect, insulated from discharge if they chose to exercise their right to strike. In our view, neither side holds all the cards, and that is as it should be. If the City refuses to bargain in good faith, it cannot discharge the firefighters even in face of a strike. If there are no contractual provisions to the contrary, the City would have "cause" to discharge strikers, and the firefighters could not themselves refuse to negotiate in good faith, secure in the knowledge that they had a fully protected right to strike.

The judgment of the district court is affirmed. Costs to respondents.

McFADDEN and BAKES, JJ., concur.

McFADDEN, Justice, specially concurring.

I concur in the opinion authored by Justice Bistline. However, by reason of statements made in the dissenting opinion of Chief Justice Shepard, I feel compelled to explain my position in regard to *School Dist. No. 351 v. Oneida Ed. Ass'n*, 98 Idaho 486, 567 P.2d 830 (1977), in which opinion I concurred with the majority.

In *Oneida* this court was dealing solely with the problems of a group of school

teachers and had before it the issue of injunctive relief granted by the trial court. Basically, that case involved consideration and interpretation of I.C. § 33–1271 et seq., enacted in 1971, the Idaho Professional Negotiations Act. In that opinion this court pointed out that

> The trial court ruled as a *matter of law* that the injunction should issue and we must assume, in the absence of any evidentiary record, that he concluded that a strike by teachers is illegal in Idaho. Assuming without deciding that he was correct in this conclusion, nevertheless, mere illegality of an act does not require the automatic issuance of an injunction.

By this statement it is evident that in *Oneida* this court was limiting the scope of its ruling, and discussion of issues beyond the limited holding must be considered dicta.

In this instant case the issue before the court dealt with firemen and the results of their strike, unlike the *Oneida* case where neither firemen, the statute peculiar to them (I.C. § 44–1811), nor a strike was involved.

---

SHEPARD, Chief Justice, dissenting.

I am much troubled with the holding of the majority today which clearly establishes that the firefighters had the right to strike. I am also greatly troubled with much that is said in arriving at that holding and likewise with much that is left unsaid. This Court last year in *School District No. 351 Oneida County v. Oneida Ed. Ass'n*, 98 Idaho 486, 567 P.2d 830 (1977), held, albeit by a divided Court, that there existed no right of a public employee to strike. The majority in *Oneida*, in arriving at its holding, noted:

> In the *private* sector the right to strike is viewed as an integral and necessary part of the collective bargaining process. However, in the public sector the denial of the right to strike has the effect of weighing the scales heavily in favor of the government during the collective bargaining process. In Idaho our legislature has made the policy judgment as to the merits of *not* providing public employees with the right to strike. Rather, it has developed statutory alternative processes to resolve labor disputes between teach-

ers and school boards. It would not be an appropriate judicial function to fault the legislature in those determinations.

*Id.* at 490–91, 567 P.2d at 834–835 (emphasis in original).

Admittedly, *Oneida* did not involve an actual strike, but rather the validity of the issuance of an injunction to prohibit a threatened strike. Nevertheless, the Court necessarily treated the issue of the right to strike and held contrary to the position asserted by the teachers there and asserted by the majority opinion today. In *Oneida* the Court clearly held that the public employees had no right to strike guaranteed by the constitution. The Court also held contra to the teachers' position that the denial of the right to strike denied them equal protection since employees in the private sector did have the right to strike. Most importantly, in *Oneida* the Court rejected the position of the teachers that the Act "inferentially grants public school teachers in the state of Idaho the right to strike since the right to strike is not expressly prohibited in that act."

The majority today asserts that since the right to strike is expressly prohibited by a statute during the term of a collective bargaining agreement, it necessarily follows that such right to strike is not prohibited at any other time. Such, in my opinion, is clearly contra to the express holding of *Oneida*. The holding of the majority today, without expressly overruling *Oneida*, can only add confusion and unequal treatment to an already disorganized and unclear field of law. Most assuredly, after today's action, firefighters at times may strike, school teachers may not.

The majority in *Oneida* stated:

> Appellants assert that the legislature has *expressly prohibited strikes by firefighters*, I.C. § 44–1811 and argue therefrom that the legislature must have intended to permit strikes by teacher-public employees, otherwise it would have prohibited those strikes *as it prohibited strikes by firefighters* . . . [Citation omitted] The legislature may well have believed that the substantial difference between

the duties performed by firefighters vis a vis teachers required the *express legislative prohibition against strikes by firefighters* and that the common law remedies available against strikes by teachers were adequate and that strikes by teachers could be prohibited but only following adequate hearings.

*Id.* at 489, 567 P.2d at 833 (emphasis added).

To adapt the reasoning of the majority in *Oneida* to the instant circumstances, we must believe that the legislature engaged in an empty gesture, attempted to and did accomplish nothing in its enactment of Title 44, Chapter 18, Idaho Code, where it attempted to take collective bargaining disputes in the firefighting sector out of the hurly-burly of the private sector labor management disputes. In my judgment, the legislature, just as it did in the case of teachers, replaced the possibility of strikes, lockouts, economic coercion, firing, retirement system benefit quarrels, and the like, with a mandatory statutory requirement for resolution of disputes. I would not ascribe such a useless action to the legislature, but would continue to adhere to the reasoning of the majority opinion in *Oneida* wherein it was held that the imposition of mandatory statutory negotiations was an attempt to balance the scales otherwise heavily weighed on the side of the employer by the forbidding of strikes as an element of the bargaining process.

A further indication that the legislature did not intend to authorize strikes by public employees, particularly firefighters, is the enactment of Title 72, Chapter 14, Idaho Code. There the legislature removed yet another item which in the private sector would be left to the bargaining process. The legislature has thereby provided a mandated retirement system for the firefighters in Idaho. One of the questions left unanswered by the majority here is whether in their right to strike in support of the bargaining process, the firefighters may assert demands for higher retirement benefits than those contained in the pertinent legislation.

It will also be of interest to public employee groups in the state of Idaho to learn if they have the right to strike only where, as here, the majority asserts that the employer failed to bargain in good faith. On the other hand, do public employees have the right to strike unencumbered by a showing or finding that the employer has failed to bargain in good faith? Who is to make that determination; do the employees possess the authority to unilaterally determine that the employer has failed to bargain in good faith? Correlatively, may the employer unilaterally determine that the employees have failed to bargain in good faith and thus lock out the employees?

The majority opinion postulates a number of bases for its holding that the firefighters here possess a right to strike. The majority first examines the statute prohibiting strikes during the term of a contract and arrives at the conclusion that since strikes at other times are not prohibited *ipso facto* they are permitted. Such is clearly contrary to the Court's holding and rationale expressed in *Oneida*. If we are to depart from that recently announced case, it should be done so in clear, explicit language which, in my judgment, is absent in today's majority opinion.

The majority next examines the legislative intent demonstrated solely by the "unchallenged testimony" of "the lobbyists in charge of the 1969 push for collective bargaining legislation;" that "testimony" was presented in an informal type hearing before the Civil Service Commission, in which it was announced that rules of evidence would not control nor be observed and which was rife with hearsay and conclusory statements. To posit that such comments are binding, persuasive, or even of passing interest to this Court in its determination of legislative intent is, to me, a new and novel rule of law. In my judgment, the cases cited by the majority in support of such a ruling are neither compelling, nor persuasive, nor applicable. In *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, the Court, in its search for legislative intent, cited the public records of appropriate congressional committees and the testimony therein of

cabinet officers. In *Data Access Systems, Inc. v. State Bureau of Securities,* 63 N.J. 158, 305 A.2d 427 (1973), certain affidavits, including that of the state attorney general, had been submitted by amicus curiae purporting to clarify legislative intent. The court conclusively stated therein, "Our conclusion as to the meaning and true intent of the statute is reached without reference to any extrinsic materials." *Id.* 305 A.2d at 432.

As stated by the majority, the city voiced its desire to call a then sitting legislator to give his opinion as to legislative intent. Such, in my judgment, would have provided no more than the ridiculous spectacle of two persons arguing about the intent of the legislature, one from within and one from without. All of such "testimony" would obviously have had to have been based on hearsay, conclusions and speculation.

The majority opinion also makes reference to certain language contained in the contract between the firefighters and the city. Such contract had expired before the actions complained of here. I find no theory upon which it can be theorized that a contract agreement between two parties authorizes and legitimizes action otherwise prohibited by law. I had always believed that such a contract provision would be held invalid as a violation of public policy.

The majority also points to various correspondence from the then Office of the Attorney General purporting to construe the provisions of the pertinent statute. The majority indicates that the firefighters might have been reasonable in placing reliance upon the first letter opining that the firefighters had a right to strike. Even assuming that the attorney general is authorized to furnish legal advice to private persons relating to matters in dispute, such reasoning, in my judgment, ignores the specific provisions of the second letter which stated clearly that an error in legal judgment had been made and that the conclusion of the first letter was in error. What the majority again does not tell us is that even in the first opinion issued by the attorney general's office, the firefighters were specifically advised that in the event they did go on strike, there was no requirement

that they could return to their jobs thereafter. "However, the corporate agent may replace the striking firefighters with replacements. *Pacific Gamble Robinson Co. v. NLRB,* 186 F.2d 106 (1950). He does not have a duty to discharge the replacements hired during the strike in order to provide positions for striking firefighters after the strike is over. *NLRB v. Mackay Radio & Tel. Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1937)."

I turn now to the discussion of the majority of the grounds for discharge by the Civil Service Commission.

In my opinion, the majority opinion ignores the express provisions of the statute which provides that the action by the *commission* will be reviewed by the district court solely to determine if it was "made in good faith and for cause * * *." Thereafter, it is provided that no court review shall be undertaken except upon those grounds. In my judgment, clearly, the only issue before the commission and before the district court was whether the refusal of the firefighters to follow a direct order and go on strike constituted a violation of the pertinent regulations of the city and the Civil Service Commission and was therefore grounds for discharge. Clearly, the firefighters did refuse to respond to a direct order and went on strike and such action was in violation of the pertinent regulations. Hence, good cause existed, in my judgment, for the order of the commission. The majority opinion, rather than examining the good faith of the *commission,* proceeds to examine the good faith of the *city* in the bargaining process. Even considering that the actions of the city during the bargaining process were relevant to a determination by the district court, I must disagree. It should be noted here that the parties had reached an impasse in their negotiations and the issues had been submitted to a fact finding body which was on the verge of making its findings and actually did make its findings dated May 9–10. As noted by an addendum to the report of the fact finding commission dated May 10, 1977, entitled "CLARIFICATION: . . . The last sentence in paragraph one reads as

follows: 'We are assuming the Food Allowance will be restored'. The statement of restoration is intended to mean to include retro-active to the date that management unilaterally decided to discontinue the benefit."

I cannot agree that the record demonstrates that the city refused to bargain in good faith. Neither can I agree "if there are no contractual provisions to the contrary, the city would have 'cause' to discharge strikers and the firefighters could not themselves refuse to negotiate in good faith, secure in the knowledge that they had a fully protected right to strike." I cannot agree that the terms of an expired contract should govern as to whether the city, by reason of a firefighters strike, had cause to discharge.

I note that the majority opinion gives no consideration to the resolution of a problem which will obviously arise following today's decision. What is to happen to the present employees of the Coeur d'Alene fire department? Insofar as the record demonstrates, they are civil service employees entitled to all the rights and benefits held by other civil service employees. They cannot be discharged except for cause and in good faith. The civil service regulations spell out in detail those reasons for discharge which constitute "cause." Nowhere therein is there provision for an employee to forfeit his job and be replaced by a former employee who has gone on strike and been discharged.

DONALDSON, Justice, dissenting.

Several important questions are raised by this appeal which I feel are not properly addressed by the majority. In addition I feel that the duties of the Civil Service Commission should be properly delineated for future guidance.

The initial question presented by this appeal concerns the procedural and jurisdictional aspects of I.C. § 50–1609. My decision on this threshold issue forces me to think that the decision of the district court should be reversed and the case remanded. Other issues have also been raised concerning public employee strikes which I feel

that this Court must decide. In addition, this Court should interpret the substantive language in I.C. § 50–1609 and I.C. §§ 44–1801 through 44–1811 which sets forth the standards for determining whether the city fulfilled its statutory obligations and whether the firefighters were legally discharged.

I

I first address the jurisdiction and authority questions, which turn on the interpretation of I.C. § 50–1609. From this statute it must be determined what procedural steps must be followed when a civil service employee is discharged and also what obligations, authority, and jurisdiction are possessed by the civil service employer, the Civil Service Commission, and the courts under this statute. Any confusion over the meaning of I.C. § 50–1609 is understandable. The statute is extremely ambiguous and confusing.

Idaho Code § 50–1609 is set out below. To facilitate quick reference to the language in I.C. § 50–1609, I have taken the liberty of numbering the individual sentences contained in the statute.

50–1609. Removals—Suspensions—Appeals—Hearings.—[1] All persons in the classified civil service shall be subject to suspension from office or employment by the head of the department for misconduct, incompetency or failure to properly observe the rules of the department. [2] Upon suspension by the head of the department or accusation by the appointing power, any citizen or taxpayer, a written statement of such suspension or accusation, in general terms, shall be served upon the accused and a duplicate filed with the commission; provided, the head of the department may suspend a member pending the confirmation of the suspension by the appointing power, which confirmation must be within three (3) days. [3] The finding of the civil service commission upon the said charges shall be certified to the head of the department and shall forthwith be enforced and followed by him. [4] The aggrieved party

shall, however, have the right within ten (10) days from the time of his removal, suspension, demotion or discharge as the case may be, to file with the commission a written demand for an investigation. [5] In conducting such investigation, the commission shall be confined to the determination of the question as to whether such removal, suspension, demotion or discharge was made for political or religious reasons, or was made in good faith and for cause. [6] All investigations made by the commission pursuant to the provisions of this section shall be by public hearing after reasonable notice to the accused of the time and place of such hearing. At such hearing the accused shall be afforded an opportunity of appearing in person or by counsel and presenting his defense. [7] If such judgment or order be upheld by a majority of the commission, the accused may appeal therefrom to the court of original and unlimited jurisdiction in civil suits of the county wherein he resides. [8] The court of original and unlimited jurisdiction in civil suits shall thereupon proceed to hear and determine such appeal in a summary manner; provided, however, that such hearing shall be confined to the determination as to whether the judgment or order of removal, discharge, demotion or suspension by the commission, was made in good faith and for cause, and no appeal to such court shall be taken except upon such ground or grounds.

I feel that the decision of the district court should be reversed and remanded. My reasons for reversal and remand will best be explained in a sentence by sentence analysis of I.C. § 50–1609.

The first sentence of the statute provides that a civil service employee is subject to suspension by the head of the department from his office or employment "for misconduct, incompetency or failure to properly observe the rules of the department." Although the first sentence attempts to outline the reasons for suspension, an employee could be suspended for any of the reasons outlined in I.C. § 50–1604.[1] Idaho Code § 50–1604 sets forth in detail the causes for removal, discharge, and suspension. The second sentence of I.C. § 50–1609 provides that a written statement of the suspension by the head of the department and implicitly the reasons for the suspension must be served on the suspended employee and a duplicate filed with the Civil Service Commission. The second sentence also provides that charges against an employee can originate from the appointing power (the city, rather than merely a head of a department within the city), a citizen, or a taxpayer. If the accusations originate from the appointing power, citizen, or taxpayer, these accusations must also be filed with the Commission and the employee. That portion of the

1. 50–1604. Examinations—Qualifications of applicants—Causes for removal, discharge or suspension of incumbents.—. . .

All incumbents and applicants thereafter appointed shall hold office, place, position or employment only during good behavior, and any such person may be removed, discharged, suspended without pay, demoted, reduced in rank, deprived of vacation privileges or other special privileges for any of the following reasons, subject to the determination of the facts in each case by the commission:

(a) Incompetency, inefficiency or inattention to, or dereliction of duty;

(b) Dishonesty, intemperance, immoral conduct, insubordination, discourteous treatment of the public or a fellow employee, or any other act of omission or commission tending to injure the public service; willful failure on the part of the employee to properly conduct himself, or any other willful violation of the civil service rules and regulations;

(c) Mental or physical unfitness for the position which the employee holds;

(d) Dishonest, disgraceful, immoral or prejudicial conduct;

(e) Drunkenness or use of intoxicating liquors, narcotics, or any other habit forming drug, liquid or preparation to such extent that the use thereof interferes with the efficiency or mental or physical fitness of the employee or which prevents the employee from properly performing the functions and duties of any position under civil service;

(f) Conviction of a felony or a misdemeanor involving moral turpitude;

(g) Any other act or failure to act, which in the judgment of the civil service commissioners is sufficient to show the offender to be an unsuitable and unfit person to be employed in the public service.

second sentence of I.C. § 50–1609 which appears after the semicolon limits the suspension power given to a department head. This language provides that any suspension by a department head is only temporary and, to continue, must be confirmed in three days by the appointing power, i. e. the city. The third sentence of I.C. § 50–1609 provides that the Civil Service Commission is to make findings on the charges which have been lodged against the employee and that these findings are to "be certified to the head of the department and . . . enforced and followed by him." Idaho Code § 50–1604 also requires findings by the Commission on charges made against an employee.

It is at this juncture that some confusion arises. The statute provides (1) for suspensions for cause, (2) the filing of a written statement of suspension or accusation, and (3) findings on the charges by the Commission. The statute, however, does not answer several questions. The first ambiguity is that regarding findings by the Commission. At this stage, the only evidence or material before the Commission is the written statement which has been filed by the employee's accusers. Although both the third sentence of I.C. § 50–1609 and the language in § 50–1604 require findings, the Commission has very little information from which it can make findings and what little information the Commission does have comes solely from the employee's accusers. It would be extremely difficult for the Commission to make findings based entirely upon this one-sided written statement. It must be pointed out that at this stage the Commission is given no vehicle or mechanism for gathering additional information or evidence. The statute does not contemplate an investigation unless it is requested by the accused employee. The second ambiguity relates to the authority to discharge. The first two sentences of I.C. § 50–1609 provide for suspensions for cause by the civil service employer. The third sentence, in addition to providing for findings by the Commission, specifies that the findings by the Commission on the charges are to be certified to the department head and followed by him.[9] This language by itself leaves us at a loss as to who actually has the authority to discharge, remove, or demote an employee or otherwise deprive the employee of some benefit. Additionally, the statute does not indicate who makes the decision as to what course of action is going to be taken against the employee. Both I.C. § 50–1604 and § 50–1609 provide for removals, discharges, suspension, etc. for certain conduct. The statutes, however, do not clearly specify where the decision making authority lies concerning sanctions or who has the authority to decide what course of action is to be taken against the employee, i. e. whether the employee will be discharged, demoted, or merely deprived of some benefit for any particular course of conduct.

The following is the most logical construction of the statute and what I believe the legislature intended. It is obvious that the initiative for any action against a civil service employee must come from the employer, a taxpayer, or a citizen. Thus, it would follow that the decision as to what punishment or what action should be taken against the employee must lie with the employer. Additionally, although the Commission is obligated to take some action after the written statement is filed, it is apparent that the Commission is not obligated to conduct an intensive investigation and make detailed findings of fact before an investigation is requested. The statute merely contemplates a cursory review of the charges by the Commission at this point. At this stage, the Commission is merely obligated to examine the charges and determine if cause for discharge, suspension, demotion, etc. would exist were there facts to support the allegations made against the employee. At this stage the Commission must assume that there are facts to support the charges. If the Commission finds that cause would exist, the Commission certifies their findings back to the employer. After the Commission has certified the matter back to the employer, the employer then issues a formal order against the employee(s). The decision as to exactly what action is to be taken against the employee logically must lie with the employer.

With these preliminary questions out of the way, I proceed to the remaining language in I.C. § 50–1609 and my reasons for reversal and remand. The procedure which is outlined above was not initially followed in this case but this is immaterial, however, because eventually, after the mandamus action steps were taken which were sufficient to satisfy these procedure requirements.

The critical language in I.C. § 50–1069 in this appeal begins with the fourth sentence. This sentence provides that within ten days of his removal, suspension, demotion, or discharge the aggrieved employee can demand an investigation by the Commission. The fifth sentence provides that in conducting the investigation, the Commission must determine whether the removal, suspension, demotion, or discharge was made for political or religious reasons or was made in good faith and for cause. It is at this stage that the actual fact finding obligations of the Commission arise. Once an investigation is requested, the Commission must hold public hearings and receive evidence from both the employee and his accusers. At the conclusion of this investigation, the Commission must make sufficiently detailed findings of fact regarding each of the questions enumerated in the fifth sentence. In making these findings the Commission is obligated to resolve conflicting evidence and to set forth in sufficient detail the operative facts it relied upon in reaching its ultimate conclusions regarding religious and political overtones, good faith, and cause.

The problem in this appeal is that the Civil Service Commission failed to make sufficient findings of fact as required by I.C. § 50–1609. The findings issued by the Commission after the investigation were inadequate. The findings amounted to only a statement of the Commission's ultimate conclusions, i. e. the firefighters were not discharged for political or religious reasons; the city had acted in good faith by discharging the firefighters; and the firefighters were discharged for cause because they had been absent from work because of the illegal strike. The Commission's findings were void of any basic findings supporting its ultimate conclusions. It is a well established principle of administrative law that an agency must make findings which are sufficiently extensive and exacting to support its conclusions. 2 K. Davis, Administrative Law Treatise § 16.01, at 435–37 (1958). This Court on previous occasions has also indicated the need and desirability of such findings by agencies. *Boise Water Corp. v. Idaho Public Utilities Comm'n*, 97 Idaho 832, 555 P.2d 163 (1976); *Mountain View Rural Tel. Co. v. Interstate Tel. Co.*, 55 Idaho 514, 46 P.2d 723 (1935).

It is necessary to point out the distinction between "ultimate" and "basic" facts. "An ultimate fact is usually expressed in the language of a statutory standard." 2 K. Davis, *supra* § 16.06, at 450. For example, I.C. § 50–1609 sets forth certain ultimate facts which must be determined by the Civil Service Commission: (1) was the discharge for political or religious reasons; (2) was the discharge made in good faith; and (3) was the discharge for cause. "Basic" findings "are those on which the ultimate findings rest; the basic findings are more detailed than the ultimate findings but less detailed than a summary of the evidence." 2 K. Davis, *supra* § 16.06, at 451. Principles of administrative law require agencies to first make basic findings from the evidence before deciding ultimate facts. The basic findings serve as a foundation for the ultimate findings.

> The practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction.

2 K. Davis, *supra* § 16.05, at 444.

The seventh and eighth sentences of I.C. § 50–1609 provide for judicial review of decisions of the Commission. After the Commission rendered its decision, the firefighters appealed to the district court pursuant to I.C. § 50–1609. Rather than remanding the action to the Commission for

detailed statement of facts, the district court proceeded to hear the appeal.

Although this Court has not before been obligated to outline the duties and jurisdiction of the Civil Service Commission and the judiciary in civil service matters, courts from our neighboring State of Washington have addressed these questions. I find these decisions, which involve statutory language comparable in pertinent part to § 50–1609, persuasive.

In *State ex rel. Perry v. City of Seattle,* 70 Wash.2d 816, 420 P.2d 704 (1966), the Washington Supreme Court stated that after an investigation has been requested by an aggrieved employee, "it then becomes the function of the civil service commission . . . to investigate, to hold a hearing, and to reach a conclusion upon the merits of the dismissal. The commission is . . . the . . . fact-finding body." *Id.* 420 P.2d at 707.

In commenting upon the judiciary's function when reviewing decisions from the Civil Service Commission, the court stated that the judiciary cannot

> consider the weight or sufficiency of the evidence. Appellate review is not a trial de novo. . . . The court is neither a fact finding agency, a policy-making body, or a hiring hall. Its function is limited to testing the legality° of the administrative procedure. . . . The crucial question is whether or not there is evidence to support the commission's conclusion. A finding or a conclusion made without evidence to support it, is, of course, arbitrary . . . but it is not arbitrary or capricious if made with due consideration of the evidence presented at the hearing. . . . Neither the trial court nor this court can substitute its judgment for the independent judgment of the civil service commission.

*Appeal of Hahn,* 12 Wash.App. 243, 529 P.2d 484, 485 (1974) (quoting from *State ex rel. Perry v. City of Seattle, supra,* 420 P.2d at 706).

Thus under I.C. § 50–1609, the Civil Service Commission is the fact finding body. The judiciary's function *"is limited* to determining whether an opportunity was given to be heard and whether competent evidence supported the charge." *Id.* 420 P.2d at 708.

Because of the inadequacy of the Civil Service Commission's findings, I believe that the district court should have remanded the cause with instructions to the Civil Service Commission to make adequate findings. The district court must give the Civil Service Commission the opportunity to fulfill its obligations and it is only after these fact finding obligations are met that the district court can properly review the decision of the Civil Service Commission.

## II

There are two requirements set forth in I.C. § 50–1609. It is important to emphasize that I.C. § 50–1609 mandates that any discharge of a civil service employee must be made both "in good faith" and "for cause." Before the Civil Service Commission can discharge any civil service employee the Civil Service Commission must first find that both "good faith" and "cause" existed.

## A

### GOOD FAITH

A complete and comprehensive definition of the "good faith" requirement of I.C. § 50–1609 is neither possible nor practical. Generally, this language means that a civil service employer cannot be arbitrary and capricious. The "good faith" requirement means that the employer must deal with employees in a fair, honest, and reasonable manner. Aside from the general "good faith" requirements of I.C. § 50–1609, additional good faith obligations are imposed on a civil service employer of firefighters by I.C. § 44–1801 through 44–1811, particularly I.C. § 44–1802 through § 44–1804.[2] These

---

2. 44–1802. Collective bargaining rights of firefighters—Representation by bargaining agent. —The firefighters in any city, county, fire district or other political subdivision in the state

of Idaho shall have the right to bargain collectively with their respective cities, counties, fire districts or political subdivisions and to be represented by a bargaining agent in such collec-

statutory provisions give firefighters collective bargaining rights and obligate civil service employers "to meet and confer in good faith" when collective bargaining agreements are being negotiated. Thus, when the Civil Service Commission is determining the legality of the firefighters' discharge, the Commission must find that the special "meet and confer in good faith" obligations of § 44–1804 were satisfied in addition to the general good faith requirements of I.C. § 50–1609.

In certain circumstances, the withdrawal of benefits after the expiration of an existing contract may constitute acts of bad faith. If benefits are withdrawn when the following fact situation is presented, the withdrawal may be an act of bad faith: (1) the public employees continue to fully perform their duties; (2) there is no question that the benefits would exist once the contract under negotiation is consummated; (3) there is no justifiable reason to believe that the payment of the benefits when there is no contract in existence would be illegal; and (4) other public employees receive similar benefits when not employed under a collective bargaining employment contract.

The firefighters claim that the city did not act in good faith, in among other things, refusing to negotiate in the period when the fact finding commission was deliberating. Idaho Code § 44–1805 [3] provides that if the parties cannot reach an agreement on a contract, "any and all unresolved

issues shall be submitted to a fact finding commission." The refusal to negotiate further after all aspects of the contract have been agreed upon except those submitted to the fact finding commission does not necessarily amount to bad faith or a dilatory tactic. If the fact finding commission was dilatory, as it appears it might have been in this case, both parties should have worked in concert to compel the fact finding commission to reach a decision.

## B

## CAUSE

If the Civil Service Commission determines that the city has satisfied the general good faith obligations imposed by I.C. § 50–1609 and the good faith obligations of I.C. § 44–1801 through 44–1811, the Commission must then turn to the question of "cause." It is important to again reemphasize that the question of "cause" need not be considered if the Commission determines that the city did *not* act in good faith. This is so because even if "cause" existed to discharge the firefighters, they could not be discharged if the city did not act in good faith.

In their cross-appeal, the firefighters argue that "cause" did not exist which would warrant their discharge. The firefighters premised this argument on the contention that they have the "right to strike."

The firefighters allege that I.C. § 44–1811,[4] which only prohibits strikes "during

tive bargaining process as to wages, rates of pay, working conditions and all other terms and conditions of employment.

44–1803. Recognition of exclusive bargaining agent.—The organization selected by the majority of the fire fighters in any city, county, fire district or political subdivision shall be recognized as the sole and exclusive bargaining agent for all of the fire fighters in the fire department, unless and until recognition of such bargaining agent is withdrawn by vote of the majority of the fire fighters of such department.

44–1804. Obligation of corporate authorities to bargain in good faith—Entering into written contract.—It shall be the obligation of the city, county, fire district or other political subdivision through its proper corporate authorities, to meet and confer in good faith with the representative or representatives of the bargaining

agent within ten (10) days after receipt of written notice from said bargaining agent of the request by the firefighters for a meeting for collective bargaining purposes. This obligation shall include the duty to cause any agreement resulting from negotiations between the bargaining agent and the proper corporate authorities to be reduced to a written contract.

3. 44–1805. Submission of issues to fact finding commission.—In the event that the bargaining agent and the corporate authorities are unable, within thirty (30) days from and including the date of their first meeting, to reach an agreement on a contract, any and all unresolved issues shall be submitted to a fact finding commission.

4. 44–1811. Strikes prohibited during contract. —Upon consummation and during the term of

the term of [a] written contract or agreement" inferentially gives them the "right to strike" when no contract is in existence. The negative pregnant which results from the language of this statute is that strikes could not be enjoined when a collective bargaining agreement is not in existence. The question of injunctions, however, is not the issue presented by this appeal. Even if we were to address this question and construe the statute as the firefighters contend, such a ruling would have no bearing on the question of "cause."

The firefighters ask us to hold that they have the "right to strike" because of a negative inference found in I.C. § 44–1811. If we were to hold that I.C. § 44–1811 did bestow rights on the firefighters, these rights would not include the right to withhold labor and services without fear of being discharged. The only rights the firefighters would receive if the statute were to be construed as they contend would be the right to engage in concerted labor activity, including the right to withhold employment, free from court injunction.

The firefighters in arguing that the above construction of I.C. § 44–1811 gives them the "right to strike," claim that *this* "right to strike" includes all of the rights generally associated with the "right to strike" as this phrase is used and understood in federal cases dealing with federal labor relations legislation or in state cases dealing with state statutes similar to federal legislation. The firefighters argue that the inferential "right to strike" found in I.C. § 44–1811 includes the right to withhold labor and services without terminating their employment and without fear of being discharged. This argument might be valid if Idaho had legislation similar to federal enactments such as the Labor Management Relations Act, 29 U.S.C. §§ 141–144, 151–158, 159–167, 171–183, 185–187, 191–197, 557 (1947). These comprehensive federal enactments expressly provide that employees who cease work in concert to apply pressure on their employers do not cease to be employees and are not actually quitting their jobs. Labor Management Relations

Act, 29 U.S.C. § 152(3) (1974). Absent comprehensive state legislation in the area of labor relations, this Court cannot adopt all of the rights normally attached to the "right to strike" when federal legislation is involved. To do so would be the exercise of a legislative power which this Court does not possess.

This is not to say that the firefighters did not have the right to withhold their labor. This is a constitutional right. U.S. Const. amend. XIII, § 1; *Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944); Jennings, The Right to Strike: Concerted Activity Under the Taft-Hartley Act, 40 Cal.L.Rev. 12 (1952). In the absence of such comprehensive labor relations legislation, however, the firefighters had no guarantee that they would not be discharged when they withheld their labor and services. Without the benefit of protective legislation, the common law rule is that anyone who refuses to work is subject to discharge. *Almond v. County of Sacramento,* 276 Cal. App.2d 32, 80 Cal.Rptr. 518 (1969); *Newmarker v. Regents of University of California,* 160 Cal.App.2d 640, 325 P.2d 558 (1958); *Pierce v. Stablemen's Union, Local No. 8760,* 156 Cal. 70, 103 P. 324 (1909). Suffice it to say that "cause," as contemplated by I.C. § 50–1609, would exist to discharge the firefighters if they refused to report to work after being specifically ordered to do so by their public employer. Whether the firefighters refused to report to work is a question of fact which should be decided by the Civil Service Commission.

Because the Commission did not make sufficient detailed findings of fact to support its finding of "good faith" on the part of the city and also that "cause" existed to discharge the firefighters the case should be reversed and the district court should remand the case back to the Civil Service Commission for specific findings.

the written contract or agreement, no firefighter shall strike or recognize a picket line of any

labor organization while in the performance of his official duties.